[No. B135352. Second Dist., Div. Five. Aug. 24, 2001.]

LOIS PAYNE et al., Plaintiffs and Appellants, v.
NATIONAL COLLECTION SYSTEMS, INC., Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.C. through III.H. of the majority opinion and the entirety of the concurring and dissenting opinion.

**COUNSEL**

Quisenberry & Kabateck, Brian S. Kabateck, Penny J. Manship; Esner & Chang, Stuart B. Esner; Law Offices of Nate G. Kraut and Nate G. Kraut for Plaintiffs and Appellants.

Carlson, Messer & Turner, Jeffery J. Carlson, Charles R. Messer and Joseph R. Zamora for Defendant and Respondent.

Bill Lockyer, Attorney General, and Ronald A. Reiter, Deputy Attorney General, for the State of California as Amicus Curiae.

OPINION

TURNER, P. J.—

I. INTRODUCTION

On August 5, 1998, before the present proposed class action was ever filed, the Los Angeles County District Attorney and the Attorney General, each acting on behalf of the People of the State of California, secured separate judgments against defendants in the present lawsuit, Trans World Airlines, Inc. (TWA) and National Collection Systems, Inc., doing business as National Credit Management (NCM). The separate August 5, 1998, judgments imposed injunctive and monetary relief and in part were based upon the provisions of Business and Professions Code sections 17200 through 17209, which are commonly called the unfair competition law. (See *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558, fn. 2 [71 Cal.Rptr.2d 731, 950 P.2d 1086]; *ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1252 [61 Cal.Rptr.2d 112, 931 P.2d 290].) As a result of the separate judgment secured by the Attorney General, 63 persons who were aggrieved by defendants' misconduct were ordered to receive restitution from NCM. None of the individuals who received restitution from NCM as a result of the August 5, 1998, separate judgment secured by the Attorney General are plaintiffs in the present class action.

In the present class action lawsuit, all 23 plaintiffs sought relief under the unfair competition law in the fourth cause of action of the second amended complaint. The trial court sustained the demurrer to the fourth cause of action of the second amended complaint for relief under Business and Professions Code section 17200 et seq. on res judicata grounds. Based on res judicata principles, the trial court reasoned plaintiffs were barred in the present class action from securing any relief because of the prior August 5, 1998, judgments imposed in the unfair competition law litigation pursued by the Attorney General and the Office of the Los Angeles County District Attorney on behalf of the People of the State of California. Based on the analysis of the Supreme Court in *People v. Pacific Land Research Co.* (1977) 20 Cal.3d 10, 17-19 [141 Cal.Rptr. 20, 569 P.2d 125], we conclude the unfair competition law judgments do not bar plaintiffs' restitution claims.

## II. THE SECOND AMENDED COMPLAINT

### A. *Overview*

Twenty-three plaintiffs in a class action commenced November 5, 1998, appeal from the demurrer dismissal of their second amended complaint against defendants, TWA and NCM for: violation of Education Code sections 94831, 94832, and 94838; violation of Business and Professions Code section 17500; violation of the Consumers Legal Remedies Act (Civ. Code, § 1750); unfair competition within the meaning Business and Professions Code section 17200; conspiracy to defraud; and fiduciary duty breach. We affirm in part and reverse in part.[1]

The second amended complaint alleged TWA and NCM entered into a conspiracy to defraud low-income job applicants out of approximately $2,800 each for a sales training course. The training course was offered by TWA and defendants jointly profited from the scheme in the sum of $7.5 million. Further, on July 8, 1996, the Attorney General and the Los Angeles County District Attorney filed a complaint against TWA and NCM which sought injunctive relief and civil penalties. On August 5, 1998, stipulated separate final judgments in the lawsuit filed by the Attorney General and the Los Angeles County District Attorney were entered against TWA and NCM, preventing them from engaging in unlawful and fraudulent practices such as were involved in the present case. Restitution was ordered paid to certain individuals. None of the persons ordered to receive restitution in the two August 5, 1998, judgments are plaintiffs in the present lawsuit. The second amended complaint in the present action alleges that TWA continued to deduct moneys from plaintiffs' paychecks in order to pay for the improper courses despite the existence of the injunction.

### B. *Conspiracy Allegations*

The second amended complaint contains substantial conspiracy allegations. As noted earlier, the second amended complaint alleged that the proposed class action lawsuit was brought by persons who were "victims of [TWA's] and [NCM's] conspiracy to defraud low income job applicants out of a fee of approximately $2,800 each for a sales reservation 'training'

---

[1]TWA has secured the protection of the bankruptcy courts. Prior to filing its bankruptcy petition, TWA filed a brief in this case. Insofar as the analysis in the TWA brief is relevant to the demurrer of NCM, we have considered it. Further, the request to defer further resolution of the present appeal pending the outcome of the bankruptcy proceedings or the filing of a motion for relief of the automatic stay has been denied. The complaint in the present case was filed on November 5, 1998. The demurrer in the present case was sustained more than 18 months ago and further delay is not in order.

course offered by TWA." It is alleged TWA and NCM conspired as to each of the transactions identified in the second amended complaint. It is further alleged that TWA and NCM "formed a conspiracy to operate the TWA Course" between 1990 and 1998 by use of "unlawful advertisements, false representations, active concealment of statutorily mandated credit terms and threats of collection . . . ." The second amended complaint alleged that defendants "conspired to effect this scheme together." The second amended complaint also alleged, "NCM acted as TWA's collection agency and aggressively pursued payment for the TWA Course despite its knowledge of the concealment from Plaintiffs of the credit terms mandated by statute and other illegal activity . . . ." The second amended complaint alleged that: defendants directed their "scheme, in large part, at poor working mothers and women who were in need of stable employment with medical benefits"; they "intentionally conspired to take advantage of persons who [were] economically vulnerable"; and both TWA and NCM were located in St. Louis, Missouri. At another point, the second amended complaint alleged, "Defendants have engaged in a conspiracy, common enterprise, and common course of conduct the purpose of which was to commit the acts of unfair competition and defraud [plaintiffs], as alleged in this [second amended] complaint, for financial gain." It is also alleged that NCM was fully aware of TWA's conduct.

### C.   *Substantive Allegations*

In terms of the substantive allegations, the second amended complaint alleged that beginning in 1990 and continuing through "some time in 1998, TWA operated purported 'vocational schools . . . .'" From 1990 through 1998, TWA placed " 'help wanted' advertisements in various publications" which were untrue and misleading. This was because TWA was unable to offer any immediate employment. Rather, the advertisements were principally designed to induce economically disadvantaged single mothers and low-income women to accept enrollment in the "TWA Course" in exchange for a potential job with medical benefits. TWA obtained authorization to provide the course from the California Department of Education, Private Postsecondary Division, and its successor the Council for Private Postsecondary and Vocational Education. TWA employees knew that Education Code section 94831 prevented them from advertising in the "help wanted" sections of newspapers or magazines. TWA concealed from state authorities the fact it was placing the advertisements in the "help wanted" sections of newspapers and magazines.

Those who responded to the advertisements were falsely told that if they completed the TWA Course, they would be guaranteed a job upon completion of the period of instruction. In fact, TWA had sole discretion as to

which applicants completed the TWA Course. Before being hired, it was necessary that the student pay dues and join a union, facts which were not disclosed to plaintiffs prior to their enrollment in the TWA Course. TWA also falsely represented that its course would allow plaintiffs to secure employment "throughout the travel industry." In fact, the TWA reservation system was one that was not used by the majority of the travel industry and other airlines. The training provided by TWA was of limited value unless the student obtained employment with that airline.

The TWA Course was not taught in a professional manner. Classes were unruly and disorganized and educational materials were rarely used. Many of the "teachers" were not accredited in compliance with California law. Each plaintiff was required to pay $2,800 for the TWA Course. If a plaintiff could not afford the entire cost of the TWA Course, he or she was required to make a down payment. The second amended complaint alleged, "TWA represented that Plaintiffs could pay the remaining balance for the TWA Course fee through interest free payroll deductions if they were employed by TWA upon completion of the course."

TWA decided which students successfully completed its course. When the course was completed, the successful applicants were offered "On The Job Training" and were told that they could be terminated for any reason. Plaintiffs were paid $811 per month but there was a deduction by TWA for between $50 and 100 per month for the course. The location where plaintiffs worked was so unsafe that it was necessary that they park in the TWA parking facility, which charged approximately $18 per month. After the deductions for the moneys charged for the TWA Course and the parking as well as union dues, plaintiffs received less than the minimum wage. Further, plaintiffs were not advised that if they left their employment, they would be charged an annual interest rate of 18 percent or more on the outstanding balance owed for the TWA Course.

The second amended complaint alleged: "TWA intentionally structured the TWA Course in the manner described . . . in order to use the TWA Course as a profit center. TWA intentionally made the TWA Course more difficult than necessary so that there was a low passage rate and TWA could collect money from many students without having to hire all the applicants solicited through 'help wanted' ads." Further, the second amended complaint alleged: "Beginning at a time . . . at least since 1990, and continuing through 1998, TWA has contracted with, and/or assigned or sold Plaintiffs' contracts for the TWA Course to . . . NCM for purpose of having NCM collect the amounts owed for the TWA Course from Plaintiffs. . . . [¶] NCM engaged in this conduct, and conspired with TWA, in order to gain

unlawful financial profits at the expense of Plaintiffs." It is further alleged that NCM staff knew of the illegality of both its conduct and that of TWA.

The second amended complaint alleged in the first cause of action the foregoing conduct violated Education Code sections 94831 and 94832 in that "help wanted" columns were used to solicit students and false promises of employment were made by TWA. Specifically, the second amended complaint alleged defendants' deceptive conduct consisted of: falsely utilizing the "help wanted" sections of newspapers and the like in order to induce plaintiffs to enroll in the TWA Course; promising applicants employment if they passed the TWA Course, when in fact it was solely in the airline's discretion as to whether a job would be offered; falsely representing the marketability of skills taught by the TWA Course; and making misleadingly incomplete statements concerning the terms of the credit extended to applicants, including failing to disclose interest payments and an accelerated payment scheme. Further, plaintiffs alleged that the conspiracy to deprive them of moneys violated Education Code section 94838, subdivision (c). This is because TWA unlawfully failed to provide requisite notice concerning the holder of the assignment of the contracts for the purchase of the TWA Course for collection which did not contain the notice required by Education Code section 94838, subdivision (c). Additionally, defendants' fraudulent conduct allegedly violated Business and Professions Code section 17500 et seq. and the Consumers Legal Remedies Act pursuant to Civil Code section 1750 et seq. Moreover, the conduct is alleged to violate the provisions of Business and Professions Code section 17200 et seq. and constitute a fraudulent conspiracy as well as a breach of fiduciary duties owed to plaintiffs. As noted previously, the present lawsuit was commenced on November 5, 1998.

III. Discussion

A. *Standard of Review*

■ Our Supreme Court has set forth the standard of review for ruling on a demurrer dismissal as follows: "On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible

legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317]; accord, *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

### B. *The Res Judicata Issue and the Fourth Cause of Action for Violation of the Unfair Competition Law*

On July 8, 1996, the Los Angeles County District Attorney and the Attorney General filed suit and later, on August 5, 1998, successfully secured injunctions against both TWA and NCM in separate judgments. Both TWA and NCM were enjoined pursuant to Business and Professions Code sections 17200 et seq. and 17500 et seq., as well as Education Code section 94952, subdivision (c)(1), from continuing with the course of conduct alleged in the second amended complaint. Further, NCM was ordered to pay $15,057.27 to the Attorney General to be placed in a restitution account, which was to be paid to 63 persons specified on pages 11 and 12 of the August 5, 1998, judgment. *No* plaintiff in the present action is listed on page 11 or 12 of the August 5, 1998, NCM judgment secured by the Attorney General. In other words, based on the documents available to us and to the trial court, no plaintiff in the present lawsuit received any money as a result of the litigation brought by the Attorney General and the Los Angeles County District Attorney which resulted in the separate August 5, 1998, judgments against TWA and NCM.

NCM correctly notes that plaintiffs in this lawsuit received no restitution or other monetary relief in the unfair competition law action filed by the Attorney General and the Los Angeles County District Attorney. Therefore, premised upon traditional res judicata principles, NCM argues that plaintiffs are barred from any relief in this lawsuit because they received no financial award in the "representative" unfair competition law action filed by the Attorney General and the Los Angeles County District Attorney. (See *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828 [88 Cal.Rptr.2d 366, 982 P.2d 229]; *Teitelbaum Furs, Inc. v. Dominion Ins. Co. Ltd.* (1962) 58 Cal.2d 601, 604 [25 Cal.Rptr. 559, 375 P.2d 439].) No doubt, res judicata principles can apply to a judgment filed in a representative class action. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 706 [63 Cal.Rptr. 724, 433 P.2d 732]; *Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828 [97 Cal.Rptr.2d 226].) ■ However, we agree with the Attorney General

and plaintiffs that traditional res judicata principles do not apply to the unfair competition law judgment secured by the prosecutors under the present circumstances.

An action brought pursuant to Business and Professions Code section 17200 et seq. by a prosecutor is fundamentally different from a class action or other representative litigation. The California Supreme Court drew this distinction in *People v. Pacific Land Research Co.*, *supra*, 20 Cal.3d at pages 17-19. In *Pacific Land Research Co.*, the Supreme Court was discussing whether the same due process requirements applicable to class actions applied to unfair competition law litigation. The victims of the unlawful business practices in *Pacific Land Research Co.* were vendees or purchasers of land. The Supreme Court held: "[W]e do not agree that consumer protection actions brought by the People, seeking injunctive relief, civil penalties and restitution, are the equivalent of class actions brought by private parties, requiring the same safeguards to protect a defendant from multiple suits and other harmful consequences. [¶] An action filed by the People seeking injunctive relief and civil penalties is fundamentally a law enforcement action designed to protect the public and not to benefit private parties. The purpose of injunctive relief is to prevent continued violations of law and to prevent violators from dissipating funds illegally obtained. Civil penalties, which are paid to the government ([Bus. & Prof. Code,] § 175536, subds. (b) and (c); Civ. Code, § 3370.1) are designed to penalize a defendant for past illegal conduct. The request for restitution on behalf of vendees in such an action is only ancillary to the primary remedies sought for the benefit of the public. (*People v. Superior Court (Jayhill)* [(1973)] 9 Cal.3d 283, 286 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191].) While restitution would benefit the vendees by the return of the money illegally obtained, such repayment is not the primary object of the suit, as it is in most private class actions." (*People v. Pacific Land Resources Co.*, *supra*, 20 Cal.3d at p. 17.)

Additionally, the Supreme Court noted that the Attorney General or other public prosecutors typically were not members of the class. The court held: "Furthermore, an action by the People lacks the fundamental attributes of a consumer class action filed by a private party. The Attorney General or other governmental official who files the action is ordinarily not a member of the class, his role as a protector of the public may be inconsistent with the welfare of the class so that he could not adequately protect their interests (Civ. Code, § 1781, subd. (b)(4)) and the claims and defenses are not typical of the class (Civ. Code, § 1781, subd. (b)(3).)" (*People v. Pacific Land Research Co.*, *supra*, 20 Cal.3d at p. 18, fn. omitted.) At another point, the Supreme Court emphasized the differences between a class action and

litigation under the unlawful competition law commenced by the Attorney General as follows, "As between the two types of proceedings there is a crucial difference which emanates from the character of the People's lawsuit as a law enforcement action." (*Ibid.*, fn. omitted.)

The Supreme Court specifically addressed the question of the nonbinding effect against consumers such as plaintiffs in this lawsuit of a determination made in unlawful competition law litigation commenced by a prosecutor in a subsequent private lawsuit. While discussing the need to give notice of potential restitution to persons defrauded by an unlawful competition law defendant when the litigation was filed by a prosecutor, the Supreme Court held: "If the Attorney General does not seek restitution in the complaint but confines his prayer for relief to an injunction and civil penalties, there is an inevitable potential of the vendees taking advantage of a preliminary or final determination in their favor. For example, in the present case if the People had not sought restitution there would have been no occasion to notify the vendees of the action. Nevertheless, the trial court could have ordered restitution on its own motion at the conclusion of the action on the merits under [Business and Professions Code] section 17535. Alternatively, the vendees could have sought to intervene after the preliminary injunction was issued and a preliminary determination on the merits made, and the trial court could have allowed intervention on the theory that 'there is risk their contributions to the venture will be used primarily to pay statutory penalties . . . .' (*People* v. *Superior Court* (*Good*) [(1976)] 17 Cal.3d 732, 737 [131 Cal.Rptr.800, 552 P.2d 760].) However, the vendees could merely await the outcome of the People's action and seek restitution in a later suit in which the defendants, if they lost in the first action, might be subject to collateral estoppel while the plaintiff-vendees would not be bound by a determination in defendants' favor in that action. [¶] These consequences flow not from any inherent unfairness in the procedures but because the People's action is fundamentally for the benefit of the public even though founded upon the same violations of law which form the basis of the claim for restitution." (*People v. Pacific Land Research Co., supra,* 20 Cal.3d at pp. 18-19, fn. omitted.)

The foregoing discussion demonstrates that the California Supreme Court views an unlawful competition law action differently from other forms of representative litigation. This is because an unlawful competition law lawsuit commenced by a prosecutor is brought fundamentally for the benefit of the public and as a law enforcement action. The Supreme Court explicitly rejected the contention that a defendant in an unlawful competition law lawsuit was entitled to the same safeguards to protect against multiple suits because such litigation was "fundamentally a law enforcement action designed to protect the public . . . ." (*People v. Pacific Land Research Co.,*

*supra,* 20 Cal.3d at p. 17.) In *Pacific Land Research Co.,* the Supreme Court further emphasized that persons who are defrauded can merely await the outcome of an unlawful competition action brought by a prosecutor and then seek restitution in a later suit. This, the California Supreme Court held once again was because the prosecutor's action was "fundamentally for the benefit of the public . . . ." (*Id.* at p. 19.) Other secondary authority has recognized that traditional res judicata principles have no application to a judgment resulting from an unlawful competition law lawsuit filed by the Attorney General or another public prosecutor in a subsequent lawsuit brought by a victim of improper business practices. (Recommendation on Unfair Competition Litigation (Nov. 1996) 26 Cal. Law Revision Com. Rep. (1996) pp. 209-210; Chilton & Stern, *California's Unfair Business Practice Statutes: Settling the "Nonclass Class" Action and Fighting the "Two-Front War"* (Cont.Ed.Bar 1990) 12 Civ. Litigation Rptr. 95, 99-100.) Therefore, because res judicata principles were inapplicable to the prior litigation commenced by the Attorney General and the Los Angeles County District Attorney, plaintiffs in this subsequent lawsuit are not barred from securing restitution because they did not receive such in the prosecutors' litigation. Further, because of the California Supreme Court's determination that res judicata effect is not to be accorded to a judgment in an unlawful competition law lawsuit commenced by a prosecutor in a subsequent lawsuit by persons defrauded by a defendant, the provisions of section 41 of the Restatement Second of Judgments have no application to this case.[2]

C.-H.*

.   .   .   .   .   .   .   .   .   .   .   "   .   .   .   .   .   .   .   .   .   .   .   .

## IV.  DISPOSITION

The order sustaining the demurrer of defendant National Collection Systems, Inc., doing business as National Credit Management, to the first,

---

[2]Section 41 of the Restatement Second of Judgments states: "(1) A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is: [¶] (a) The trustee of an estate or interest of which the person is a beneficiary; or [¶] (b) Invested by the person with authority to represent him in an action; or [¶] (c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or (d) An official or agency invested by law with authority to represent the person's interests; or [¶] (e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member. [¶] (2) A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process. [¶] Exceptions to this general rule are stated in [section] 42."

*See footnote, *ante,* page 1037.

second, third, and fourth causes of action is reversed. The order sustaining the demurrer to the fifth and sixth causes of action without leave to amend is affirmed. The demurrer dismissal as to the first through fourth causes of action is reversed. Plaintiffs shall each recover their costs incurred on appeal from defendant, National Collection Systems, Inc., doing business as National Credit Management.

Armstrong, J., concurred.

**GRIGNON, J.,** Concurring and Dissenting.—*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1037.