[No. A128398. First Dist., Div. Three. Jan. 31, 2011.]

DANIELLE BOLOGNA et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

## COUNSEL

Walkup, Melodia, Kelly & Schoenberger, Michael A. Kelly, Matthew D. Davis; and Kris W. Kobach for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Joanne Hoeper, Chief Trial Deputy Attorney, Scott D. Wiener and Donald Margolis, Deputy City Attorneys, for Defendants and Respondents.

OPINION

SIGGINS, J.—This case arises from the tragic and senseless killings of Anthony Bologna and his sons Michael and Matthew, who were stopped in traffic in San Francisco when Edwin Ramos, an illegal immigrant, allegedly shot and killed them. Plaintiffs Danielle, Andrew, and Francesca Bologna are decedents' survivors and next of kin, and appeal from a judgment entered after the trial court sustained the demurrer of defendants the City and County of San Francisco, Gavin Newsom, Heather Fong, and William Sifferman (jointly, the City) without leave to amend. The narrow question posed in this appeal is whether the surviving family members can proceed in tort against the City under a theory that San Francisco's policy to provide sanctuary to illegal immigrants was a legal cause of decedents' murders because it shielded Ramos from deportation in violation of state and federal statutes. We conclude, as did the trial court, that the alleged breaches of those statutes support neither a legally viable claim of negligence per se under Evidence Code section 669 nor breach of mandatory duties under Government Code section 815.6. We therefore affirm the judgment.

## BACKGROUND

The trial court accurately summarized the relevant allegations of the complaint as follows: "Plaintiffs' complaint alleges that on June 22, 2008, Edwin Ramos fatally shot Anthony Bologna, 48, and two of his sons, Michael, 20, and Matthew, 16, as they sat in their family car. A third son, Andrew, 18, also sat in the car and witnessed the murders, but he was not shot. These tragic and horrific crimes occurred in San Francisco. . . .

"The complaint alleges that Edwin Ramos is a citizen of El Salvador but has lived in San Francisco for years before the June 22 incident. He was in this country in violation of the Immigration and Nationality Act ('INA'), 8 U.S.C. § 1101, *et seq.* When he murdered the decedents, Ramos was a member of the Mara Salvatrucha (or 'MS-13') street gang and had belonged for years. MS-13 is known to traffic in illegal drugs and narcotics throughout the United States including in San Francisco, and its members are known to ruthlessly maintain and increase the gang's share of the illegal drug market by committing murder and other crimes of violence, sometimes for no purpose other than to cause terror and fear. Plaintiffs allege that Ramos was heavily involved in the illegal drug trade in San Francisco for years before the Bologna murders, and that the murders were related to his membership in MS-13.

"The complaint alleges that Ramos has been arrested by San Francisco police officers on multiple occasions for violent crimes and drug offenses and

has been identified as a suspect in other serious crimes, including murder. Ramos was an adult when he murdered the Bolognas, but he had also committed within San Francisco many drug offenses and crimes of violence when he was a minor. As a result, he had multiple referrals to, and contacts with, the San Francisco Police Department and the Juvenile Probation Department before he committed the Bologna murders. As a minor, City officials transported Ramos to and kept him at a group home for juveniles and the Log Cabin Ranch School, which is a post adjudication facility for male juveniles who have been adjudged delinquent. Defendants knew that Ramos and MS-13 targeted for death Latino-appearing males who were not members of MS-13.

"The complaint alleges that prior to the Bologna murders, the City and County of San Francisco adopted 'sanctuary policies,' whereby City officials harbored individuals they knew to be illegal aliens who had committed drug offenses and violent crimes. Plaintiffs contend that San Francisco's sanctuary policies violated state and federal laws. Plaintiffs also allege that if at the time of any of Ramos's prior arrests San Francisco officials had reported Ramos to United States Immigration and Customs Enforcement ('ICE'), it is a certainty that ICE would have initiated removal proceedings against him and that Ramos would have been deported. Plaintiffs claim that although San Francisco police officers knew that they were required by state law to report Ramos's drug-related arrests and detentions to federal immigration officials, they were prevented by the sanctuary policies from doing so. Plaintiffs assert that it was reasonably foreseeable that Ramos would commit violence upon San Francisco citizens including the decedents, and would likely murder males simply because they appeared to be Latino."

Plaintiffs alleged claims for general negligence, negligent infliction of emotional distress, and violation of mandatory duties imposed by law.[1]

## DISCUSSION

### I.  *Standard of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of

---

[1] Additional causes of action for federal civil rights violations and racketeering are not involved in this appeal.

the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317]; see *Payne v. National Collection Systems, Inc.* (2001) 91 Cal.App.4th 1037, 1043–1044 [111 Cal.Rptr.2d 260].)

## II. *Analysis*

■ Plaintiffs acknowledge that, absent a "special relationship," public entities ordinarily bear no common law duty to protect specific individuals against crime. (See *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171]; *Thompson v. County of Alameda* (1980) 27 Cal.3d 741 [167 Cal.Rptr. 70, 614 P.2d 728].) Rather, they assert defendants are liable pursuant to the doctrines of negligence per se under Evidence Code section 669 and failure to discharge a statutorily mandated duty under Government Code section 815.6. Our analysis under both provisions involves statutory interpretation, and therefore presents questions of law. (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898 [95 Cal.Rptr.3d 183, 209 P.3d 89]; *Capolungo v. Bondi* (1986) 179 Cal.App.3d 346, 350 [224 Cal.Rptr. 326].) Neither statute supports a cause of action in the circumstances presented in this case.

■ Evidence Code section 669, subdivision (a), provides: "The failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." Government Code section 815.6 imports a parallel construct into the sphere of public entity liability. It provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." "The similarity between Government Code section 815.6 and Evidence Code section 669 is not accidental. . . . ' "In its practical application, [the] standard for determining whether a mandatory duty exists is virtually identical to the test for an implied statutory duty of care." . . . [Although] there is a

semantic distinction in the labels attached to each cause of action, there is no legal difference in the analytic process to determine the existence of a duty of care.' " (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 939, fn. 7 [80 Cal.Rptr.2d 811, 968 P.2d 522]; see *Tirpak v. Los Angeles Unified School Dist.* (1986) 187 Cal.App.3d 639, 646 [232 Cal.Rptr. 61]; *Keech v. Berkeley Unified School Dist.* (1984) 162 Cal.App.3d 464, 470–471 [210 Cal.Rptr. 7].)

■ Central to claims asserting both negligence per se and violation of a mandatory duty is the requirement that the harm allegedly caused is of the precise nature a statute was designed to prevent. (See *Hoff v. Vacaville Unified School Dist., supra,* 19 Cal.4th at p. 939 & fn. 7; *Keech v. Berkeley Unified School Dist., supra,* 162 Cal.App.3d at pp. 469–470.) Plaintiffs predicate their claims on two statutes, one state and one federal. ■ "In interpreting a statute, we apply the usual rules of statutory construction. 'We begin with the fundamental rule that our primary task is to determine the lawmakers' intent. [Citation.] . . . To determine intent, " 'The court turns first to the words themselves for the answer.' " [Citations.] "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . ." ' [Citation.] We give the language of the statute its 'usual, ordinary import and accord significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. . . . The words of the statute must be construed in context, keeping in mind the statutory purpose . . . . Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.' " (*Kane v. Hurley* (1994) 30 Cal.App.4th 859, 862 [35 Cal.Rptr.2d 809].) We thus examine each of the statutes identified by plaintiffs to determine whether they support a tort claim.

## A. *Health and Safety Code Section 11369*

Section 11369 of the Health and Safety Code (section 11369) provides: "When there is reason to believe that any person arrested for a violation of [any of 14 specified drug offenses] may not be a citizen of the United States, the arresting agency shall notify the appropriate agency of the United States having charge of deportation matters."[2] Plaintiffs contend the City violated this provision by "adopting, and enforcing [its] illegal sanctuary policies so as to cause Ramos to not be reported to ICE and to not be subjected to deportation proceedings. As a result, Ramos was free to commit crimes on the streets of San Francisco." Assuming the truth of plaintiffs' allegation for

---

[2] The drug offenses are those specified in Health and Safety Code sections 11350, 11351, 11351.5, 11352, 11353, 11355, 11357, 11359, 11360, 11361, 11363, 11366, 11368 and 11550.

purposes of the demurrer, no tort liability can arise solely as a result of the statutory violation unless the injury was either "of the precise nature the provision . . . was specifically designed to prevent" (*Keech v. Berkeley Unified School Dist., supra,* 162 Cal.App.3d at p. 469; see Gov. Code, § 815.6) or "resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent" (Evid. Code, § 669, subd. (a)(3)). We agree with the trial court that plaintiffs cannot make either showing.

The conduct and harm sought to be prevented by section 11369 were discussed in *Fonseca v. Fong* (2008) 167 Cal.App.4th 922 [84 Cal.Rptr.3d 567]. There, Division Two of this court rejected a claim that section 11369 is preempted by federal law because it impermissibly regulates immigration. Based on its consideration of the pertinent legislative history, the *Fonseca* court concluded that section 11369 was enacted for the purpose of combating the sale and use of illicit narcotics. "The present language of Section 11369 evidently reflects a legislative conviction that federal deportation of persons arrested for selling or using narcotics and reasonably believed to be nonciti-zens could be effectuated with much greater 'certainty and celerity' (if federal authorities determined they were unlawfully present in this country) than the prosecution and conviction of such persons for violation of state narcotics laws, and that exposure of such persons to swift imposition of that civil penalty would help 'stamp out illicit drug traffic' in California. Other aspects of the legislative history confirm this view. For example, the letter from the author of the bill to the Governor asking him to sign the measure enacting Section 11369 in its present form described it as 'the main narcotics bill' enacted by the Legislature that session. [Citation.] A memorandum sent by the author of the measure to all members of the Legislature identifies each of the numerous individuals who had assisted in its drafting. All were represen-tatives of state or federal agencies charged with enforcement of narcotics laws; none represented an agency or organization primarily interested in enforcement of federal immigration laws. [Citation.] Significantly, the Assembly Committee on Judiciary reported that the bill 'to require that the agency arresting any person for a narcotic violation must notify the appropri-ate agency of the United States having charge of deportation matters when there is reason to believe that said person is not a citizen of the United States' was considered and passed as part of a package of measures that were all designed '*to prevent narcotics from entering the Country.*' [Citation.] [¶] Finally, if the chief legislative purpose of Section 11369 was the regulation of immigration rather than the sales and use of narcotics, the measure would not have been limited to persons arrested only for narcotics offenses . . . ." (*Fonseca v. Fong, supra,* at pp. 940–941.)

Plaintiffs have provided neither authority nor additional legislative history to contradict *Fonseca*'s conclusion that the Legislature enacted section 11369 to combat the illegal drug trade, and we find it compelling. This

legislative purpose is fatal to plaintiffs' claims. The fact that reporting suspected illegal immigrants arrested for drug offenses to the federal immigration authorities may also prevent them from committing violent crimes is not enough to warrant our conclusion that section 11369 creates an actionable tort on behalf of the general public. " '[Government Code s]ection 815.6 requires that the mandatory duty be "designed" to protect against the particular kind of injury the plaintiff suffered. The plaintiff must show the injury is " 'one of the consequences which the [enacting body] sought to prevent through imposing the alleged mandatory duty.' " [Citation.] Our inquiry in this regard goes to the legislative *purpose* of imposing the duty. *That the enactment "confers some benefit"* on the class to which plaintiff belongs is not enough; if the benefit is "incidental" to the enactment's protective purpose, the enactment cannot serve as a predicate for liability under section 815.6.' " (*Guzman v. County of Monterey, supra,* 46 Cal.4th at p. 898, italics added; see *Nunn v. State of California* (1984) 35 Cal.3d 616, 625–626 [200 Cal.Rptr. 440, 677 P.2d 846]; *Hoff v. Vacaville Unified School Dist., supra,* 19 Cal.4th at pp. 938–939 [no liability under Evid. Code, § 669 or Gov. Code, § 815.6 for injury to nonstudent where the allegedly violated provision was designed primarily to safeguard students].) While section 11369 may benefit the public by removing violent drug offenders from our midst, the legislative history and the statute's limitation to specified drug offenses confirm that this benefit is incidental.

Plaintiffs' contrary arguments are not persuasive. They rely primarily on one isolated comment in the legislative history that suggests section 11369 was enacted in part to minimize violent crime. As related in *Fonseca,* in 1951 the state Senate created a committee on narcotics and hypnosis. According to the initiating Senate resolution, the committee was created because " 'recent reports of the pathetic and tragic cases of narcotic addictions by teen-age youngsters have shocked the citizens of this State; and [¶] . . . It is the belief of our own enforcement agencies that there exists a deliberate exploitation of naïve boys and girls by drug traffickers, who aim to open up a new market by enslaving a huge new crop of addicts; and [¶] . . . There is urgent need for a comprehensive study of the means to deal with this *death-dealing type of racket* and to stamp out illicit drug traffic . . . .' " (*Fonseca v. Fong, supra,* 167 Cal.App.4th at p. 940, italics added.)

In plaintiffs' view, this reference to the narcotics trade as a "death-dealing type of racket" shows that prevention of violent crimes such as the Bologna murders was one purpose of section 11369. We disagree. A fair reading of the legislative history reveals no indication of an intent to remove undocumented immigrants from the country for any reason other than to combat the drug trade, and the resolution's reference to the potentially lethal effects of drugs and addiction does not change that fact. Moreover, as *Fonseca* notes, there would be no reason to restrict the scope of the statute to drug violations had

the Legislature enacted the notification requirements of section 11369 as a general tool for fighting violent crime. (*Fonseca v. Fong, supra,* 167 Cal.App.4th at p. 941.)

Even less persuasive is plaintiffs' suggestion that the *Fonseca* court *agreed* with their claim that section 11369 was designed to prevent violent crime because it "reiterated . . . without disagreement" Fonseca's allegation that compliance with the provision would have lowered the incidence of violent crime. Any such suggestion blatantly mischaracterizes the opinion. The *Fonseca* court merely recited the allegations of the petition before it to explain the factual and procedural background of the case. (*Fonseca v. Fong, supra,* 167 Cal.App.4th at p. 927.) That recitation in no way reflects the court's view of the Legislature's intent in enacting section 11369.

■ We conclude that section 11369 supports neither a tort claim based upon negligence per se nor on the breach of a mandatory duty.

### B. *Title 8 United States Code Section 1373*

■ Enacted as part of the Illegal Immigration Reform and Responsibility Act of 1996 (Pub.L. No. 104-208 (Sept. 30, 1996) 110 Stat. 3009), title 8 United States Code section 1373(a) invalidates all restrictions on the voluntary exchange of immigration information between federal, state and local government entities and officials and federal immigration authorities. It provides: "Notwithstanding any other provision of Federal, State, or local law, a Federal, State or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Plaintiffs' claim that title 8 United States Code section 1373(a) provides a basis for liability under Government Code section 815.6 and Evidence Code section 669 fails for the same reason as their Health and Safety Code section 11369 claim—the federal statute was not designed or intended to prevent the type of harm that plaintiffs suffered.

Because the language of title 8 United States Code section 1373(a) contains no indication that Congress intended the provision be enacted to protect individuals from violent crime, we look at its broader historical and legislative context. (See *Kane v. Hurley, supra,* 30 Cal.App.4th at p. 862.) The House report on the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Pub.L. No. 104-208 (Sept. 30, 1996) 110 Stat. 3009) describes the purpose of the act as "to improve deterrence of illegal immigration to the United States by increasing border patrol and investigative personnel, by increasing penalties for alien smuggling and for document

fraud, by reforming exclusion and deportation law and procedures, by improving the verification system for eligibility for employment, and through other measures, to reform the legal immigration system and facilitate legal entries into the United States, and for other purposes. . . ." (H.R.Rep. No. 104-469, 2d Sess., p. 1 (1996).)

In commenting on the language that was codified as title 8 United States Code section 1373, the House report observes: "This section is designed to prevent any State or local law . . . that prohibits or in any way restricts any communication between State and local officials and the INS. The Committee believes that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the U.S. undetected and unapprehended." The Senate report for the bill elaborated that "[e]ffective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." (Sen.Rep. No. 104-249, 2d Sess., pp. 19–20 (1996).) Rather than support plaintiffs' theory that the legislation was intended to protect the public from violent crimes committed by illegal immigrants, these reports demonstrate legislative intent to facilitate the enforcement of federal immigration law by eliminating restrictions on the voluntary flow of immigration information between state and local entities and federal immigration officials. (See *Sturgeon v. Bratton* (2009) 174 Cal.App.4th 1407, 1423 [95 Cal.Rptr.3d 718] ["Congress's objective in enacting section 1373 was to eliminate any restrictions on the voluntary flow of immigration information between state and local officials and ICE; indeed, the express language of section 1373 does just that."].)

Plaintiffs point to several comments in the House congressional record from 2005 and 2007, long after title 8 United States Code section 1373 was enacted, concerning a proposed amendment that would deny federal funding to local governments that refused to share information with federal immigration authorities. These comments demonstrate that at least three members of the 110th Congress voiced concerns that sanctuary policies 'can result in releasing criminals back on the streets to do more harm. They are of questionable significance because the amendment was never enacted into law. Moreover, they cast no light on the intent of the 104th Congress when it enacted the law some 10 years earlier. Plaintiffs identify nothing in the language or historical circumstances of title 8 United States Code section 1373 that indicates it was designed to protect the public from violent crimes such as the tragedy that befell the Bologna family. While prevention of such a tragedy might be an effect of the provision, a benefit that is incidental to the enactment's purpose does not support tort liability under Government Code

section 815.6 or Evidence Code section 669. (*Guzman v. County of Monterey, supra*, 46 Cal.4th at p. 898; *Nunn v. State of California, supra*, 35 Cal.3d at pp. 625–626.)

We conclude that plaintiffs cannot premise their tort claims against the City on title 8 United States Code section 1373(a) or Health and Safety Code section 11369.[3] We therefore affirm the judgment entered on the order sustaining the City's demurrer without leave to amend.

## DISPOSITION

The judgment is affirmed.

Pollak, Acting P. J., and Jenkins, J., concurred.

---

[3] Because we so conclude, we will not address whether Government Code section 815.6 or Evidence Code section 669 can establish a duty of care in the absence of an underlying claim of ordinary negligence. (See *Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28, 39 [103 Cal.Rptr.2d 594] [negligence per se presumption supplies only standard of care, not the existence of a duty]; *Rice v. Center Point, Inc.* (2007) 154 Cal.App.4th 949, 958–959 [65 Cal.Rptr.3d 312] [same]; *California Service Station etc. Assn. v. American Home Assurance Co.* (1998) 62 Cal.App.4th 1166, 1177–1180 [73 Cal.Rptr.2d 182] [same]; but see *Elsner v. Uveges* (2004) 34 Cal.4th 915, 927, fn. 8 [22 Cal.Rptr.3d 530, 102 P.3d 915] [negligence per se may establish duty of care *or* standard of care]; *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1074–1075 [68 Cal.Rptr.2d 859, 946 P.2d 817] (conc. opn. of Kennard, J.); *id.* at pp. 1076–1077 (conc. opn. of Werdegar, J.).)