[No. B184489. Second Dist., Div. Six. Sept. 28, 2006.]

CANIEVA HOOD et al., Plaintiffs and Appellants, v.
SANTA BARBARA BANK & TRUST et al., Defendants and Respondents.

528

## Counsel

The Sturdevant Law Firm, James C. Sturdevant, Monique Olivier; The National Consumer Law Center, Stuart Rossman and Chi Chi Wu for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Albert Norman Shelden, Assistant Attorney General, Ronald A.

Reiter and Michele R. Van Gelderen, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Eric Halperin, Kathleen Keest and Amanda Quester for Center for Responsible Lending and National Association of Consumer Advocates as Amici Curiae on behalf of Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton and D. Ronald Ryland for Defendants and Respondents Santa Barbara Bank & Trust and Pacific Capital Bank N.A.

Stroock & Stroock & Lavan, Julia B. Strickland, Stephen J. Newman, Deborah E. Barack and Nancy M. Lee for Defendants and Respondents Beneficial National Bank, Household Bank, F.S.B., HSBC Taxpayer Financial Services Inc., and JPMorgan Chase Bank, N.A.

## OPINION

**COFFEE, J.**—Canieva Hood and the Congress of California Seniors appeal from an order of dismissal of their class action complaint seeking monetary and injunctive relief against Santa Barbara Bank & Trust (Santa Barbara) and other respondents. This dispute concerns Santa Barbara's seizure of Hood's tax refund. While seeking a tax refund anticipation loan (RAL) in 2002, Hood completed Santa Barbara's RAL application which provided that she would (1) pledge her 2001 tax refund as security for a RAL, (2) authorize the Internal Revenue Service (IRS) to deposit her refund into a Santa Barbara account, and (3) authorize Santa Barbara to use her 2001 refund to pay her preexisting debts to other RAL lenders. Santa Barbara denied Hood's loan application because a third party bank claimed that she owed it money for a preexisting RAL. After the IRS deposited Hood's 2001 refund into the Santa Barbara account, Santa Barbara paid it to the third party bank.

Appellants' complaint includes a tort claim for conversion, and other causes of action based on several laws, including the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq. (the CLRA)), the unfair competition law (Bus. & Prof. Code, § 17200 et seq. (the UCL)), and the Rosenthal Fair Debt Collection Practices Act (Civ. Code, § 1788 et seq.). Although Santa Barbara denied Hood's loan application, the trial court granted respondents' motion for judgment on the pleadings on the ground that federal regulations governing lending and other banking activities expressly preempted appellants' claims. We reverse.

## FACTUAL AND PROCEDURAL HISTORY

Jackson Hewitt, Inc. (Jackson Hewitt) and its affiliates, Cendant Corporation and Tax Services of America market tax preparation services to consumers.[1] Many low income taxpayers who receive the earned income tax credit seek assistance preparing their returns from tax preparation services. With Santa Barbara, Jackson Hewitt and its affiliates offer RAL's and similar products to low income taxpayers and other consumers.

An RAL is a short-term loan secured by a consumer's expected tax refund. When a lender accepts an RAL application, it establishes a bank account to receive the tax refund. The RAL applicant signs documents authorizing the IRS to deposit the applicant's tax refund in that account. If the applicant's tax refund is less than expected, or is not deposited, the bank holds the consumer liable for any outstanding RAL balance (including outstanding balances that the applicant may owe to other specified lenders for RAL's issued in prior years), plus late fees. In 2002, Santa Barbara charged an annual percentage rate ranging from 59.35 to 405.58 percent for RAL's.

Banks making RAL's, including Santa Barbara and respondent Household Bank, participate in agreements with other banks to collect outstanding RAL debts from RAL customers (cross-collection agreements). RAL lenders include a provision in RAL applications to implement the cross-collection agreement (cross-collection provision).

Appellant Hood is a taxpayer who received the earned income tax credit for several years. On January 31, 2002, Hood went to a Jackson Hewitt office for tax preparation service. A Jackson Hewitt employee told Hood that she had two options for a quick refund—a "rapid refund" that she could receive the next day, or another refund that would be payable within 48 hours. The Jackson Hewitt employee did not explain that these options were loans. Hood selected the option for payment within 48 hours.

After preparing Hood's tax returns, the Jackson Hewitt employee instructed Hood to sign and initial a set of documents. Hood did not have an opportunity to read those documents, including a "Santa Barbara Bank & Trust Refund Anticipation Loan Application and Agreement" (RAL application). The Jackson Hewitt employee did not inform Hood that the RAL application contained a provision allowing Santa Barbara to seize her anticipated tax refund if she had any prior outstanding RAL debts payable to other RAL lenders.

---

[1] Cendant Corporation owns and operates Jackson Hewitt and Tax Services of America.

The RAL application consists of four pages, each containing two columns of very fine single-spaced text. The cross-collection provision appears as section 6, at the bottom of the second page of the RAL application, as follows:

"COLLECTION OF DELINQUENT RAL. You authorize JHI [Jackson Hewitt] and SBBT [Santa Barbara] to exchange information about your current and prior RALs with other RAL lenders including Bank One, N.A., Beneficial National Bank/Household Bank, First Security Bank, River City Bank, County Bank of Rehoboth Beach, DE and Republic Bank & Trust Company/Refunds Now. If you have delinquent RALs from prior years with SBBT or any one or more of these lenders that have not been discharged in bankruptcy, you will not be eligible for a RAL but will instead receive an ACR [Accelerated Check Refund]. Upon receipt of your tax refund, you authorize SBBT to deduct from the Account, after deducting the applicable fees as set forth in Section 2 above, the total amount due on the prior year RALs and forward such amount to the appropriate RAL lender(s) prior to disbursing the balance of the Account to you."

The cross-collection provision is referenced elsewhere in the RAL application, for example, as "amounts due pursuant to section 6" or as "the collection authorizations in section 6." This provision implements cross-collection agreements whereby participating banks collect each others' RAL debts by seizing the tax refunds of taxpayers who apply for RAL's or similar products.

In signing the RAL application, the applicant acknowledges having read, understood, and agreed to each of its terms and conditions and having consented to the collection authorizations in section 6. The applicant also assigns his or her federal income tax refund and "[a]ccount, and all funds deposited therein, to the extent necessary to reimburse [Santa Barbara] for . . . any other amounts pursuant to this RAL application." In addition, the applicant certifies having "read all documents relating to [the] RAL Application." (RAL Application, §§ 7, 8, 9.)

Santa Barbara sent Hood a letter dated February 3, 2002, stating that her RAL was denied because Santa Barbara had "been informed of an outstanding [RAL] debt with [Household Bank]." Santa Barbara's letter stated that Hood's 2001 tax refund would be used to satisfy the Household Bank RAL debt and that Santa Barbara would send Hood any funds remaining after the Household Bank RAL debt was satisfied.

Hood did not receive her 2001 tax refund. Nor did she receive the Accelerated Check Refund described in the RAL application as an alternative

product for applicants who were ineligible for RAL's. Without her tax refund, Hood could not pay her rent and she received an eviction notice. Hood and other class members suffered substantial economic losses as a result of the seizure of their tax refunds.

Appellants filed an amended class action complaint seeking damages and other relief for the tort of conversion, and under the UCL, the CLRA and the Rosenthal Fair Debt Collection Practices Act. Respondents filed demurrers to appellants' third amended complaint. The trial court overruled the demurrers to the third amended complaint (except as to one cause of action against Jackson Hewitt and another cause of action against Cendant Corporation and Tax Services of America).

After the court overruled respondents' demurrers, Santa Barbara filed a cross-complaint seeking indemnity from other cross-collection agreement participants: Household Bank, F.S.B.; Beneficial National Bank; Household Tax Masters, Inc.; Bank One, N.A. (Ohio); First Bank of Delaware; Republic First Bank; First Security Bank of Mackinaw, Illinois; Republic Bank & Trust Company; River City Bank, Inc. Santa Barbara and the cross-defendants filed motions for judgment on the pleadings or, in the alternative, for summary adjudication, based on the affirmative defense of preemption. Because the trial court had issued orders limiting discovery, appellants opposed the motion for summary adjudication as premature while substantively opposing the motion for judgment on the pleadings. The trial court granted the motion for judgment on the pleadings on the ground that the regulations of the Office of the Comptroller of the Currency (OCC) expressly preempted appellants' state law causes of action.

## DISCUSSION

The trial court concluded that appellants' claims were expressly preempted by provisions of the OCC's "visitorial powers" regulation (12 C.F.R. § 7.4000(a) (2006)),[2] deposit-taking regulation (§ 7.4007(b)(2)(ii), (iv)), and non-real-estate-lending regulation (§ 7.4008(d)(2)(ii)). The trial court did not decide whether appellants' claims were also barred by the provisions in the OCC regulations that preempt state laws that obstruct, impair, or condition a national bank's ability to fully exercise its federally authorized deposit-taking powers (§ 7.4007(b)(1)), or non-real-estate-lending powers (§ 7.4008(d)(1)), or any other federally authorized powers (§ 7.4009(a)). The trial court consequently did not consider the evidence that respondent banks offered to

---

[2] All further section references are to parts of title 12 of the Code of Federal Regulations unless otherwise specified.

show that the application of state law to the RAL lending program would more than incidentally affect the exercise of their federally authorized powers.[3]

# I

## *Standard of Review*

" 'A motion for judgment on the pleadings performs the same function as a general demurrer, and hence attacks only defects disclosed on the face of the pleadings or by matters that can be judicially noticed. [Citations.]' (*Cloud v. Northrop Grumman Corp.* [(1998)] 67 Cal.App.4th [995,] 999 [79 Cal.Rptr.2d 544].) ' "Our only task in reviewing a ruling on a demurrer is to determine whether the complaint states a cause of action." ' (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) ' "[W]e are not bound by the determination of the trial court, but are required to render our independent judgment on whether a cause of action has been stated." [Citation.]' (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 198 [51 Cal.Rptr.2d 622].) We accept as true the complaint's factual allegations and give them a liberal construction. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515–516 [101 Cal.Rptr.2d 470, 12 P.3d 720].) 'We consider evidence outside the pleadings which the trial court considered without objection. [Citation.]' (*Pomona College v. Superior Court* [(1996)] 45 Cal.App.4th [1716,] 1721 [53 Cal.Rptr.2d 662].)" (*Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1064–1065 [20 Cal.Rptr.3d 562].)

"Because a motion for judgment on the pleadings, like a demurrer, raises only questions of law, we may consider new theories on appeal to challenge or justify the trial court's ruling. (*O'Neil v. General Security Corp.* (1992) 4 Cal.App.4th 587, 606 [5 Cal.Rptr.2d 712]; *B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959 [230 Cal.Rptr. 192].) '[W]e review the trial court's disposition of the matter, not its reasons for the disposition. [Citation.]' (*Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448 [37 Cal.Rptr.2d 790].)" (*Burnett v. Chimney Sweep, supra,* 123 Cal.App.4th at p. 1065.)

Similarly, a trial court's determination on issues regarding federal preemption involves questions of law which we independently review on appeal. (*Washington Mutual Bank v. Superior Court* (2002) 95 Cal.App.4th 606, 612 [115 Cal.Rptr.2d 765].) In independently determining the preemptive effect of

---

[3] The trial court did not reach the motion for summary adjudication and expressly stated that further discovery would not influence its decision.

statutes or regulations, we do not defer to the trial court's conclusion or limit ourselves to the evidence of intent considered by the trial court. (*Gibson v. World Savings & Loan Assn.* (2002) 103 Cal.App.4th 1291, 1297 [128 Cal.Rptr.2d 19].)

## II

### General Principles of Preemption

■ Congress has the authority to preempt state law by virtue of the supremacy clause of the United States Constitution, which provides that "Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2; see *Washington Mutual Bank v. Superior Court, supra*, 95 Cal.App.4th at p. 612, citing *Smiley v. Citibank* (1995) 11 Cal.4th 138, 147–148 [44 Cal.Rptr.2d 441, 900 P.2d 690].) Three forms of preemption may occur: (1) Express preemption: " 'where Congress expressly specifies that its enactment preempts state law' "; (2) field preemption: " 'where the scheme of federal regulation is so pervasive that there is a reasonable inference Congress intended to dominate the field and state laws on the same subject are precluded' "; and (3) conflict preemption: " 'where federal law actually conflicts with state law and it is impossible for a private party to comply with both requirements.' " (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1476 [38 Cal.Rptr.3d 653] (*Smith*), review den. Apr. 26, 2006, citing *Monarch v. Southern Pacific Transportation Co.* (1999) 70 Cal.App.4th 1197, 1204–1205 [83 Cal.Rptr.2d 247].)[4]

■ " 'Federal regulations may preempt state law just as fully as federal statutes. [Citation.] An agency may preempt state law through regulations that are within the scope of its statutory authority and that are not arbitrary.' " (*Smith, supra*, 135 Cal.App.4th at p. 1475, fn. 6, citing *Washington Mutual Bank v. Superior Court, supra*, 95 Cal.App.4th at p. 612 and other authorities.)

■ "In determining whether a federal statute or regulation preempts a state law, we begin with the general presumption that under the supremacy clause of the United States Constitution a federal statute or regulation does not preempt a state's historic police powers unless preemption is a clear and manifest purpose of the United States Congress. (U.S. Const., art. VI, cl. 2; *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407,

---

[4] Respondents argue appellants' claims are expressly preempted by the OCC regulations, presumably abandoning any argument that those claims are barred by either field preemption or conflict preemption.

112 S.Ct. 2608].)" (*Smith, supra,* 135 Cal.App.4th at p. 1475.) " 'The states' historic police powers include the regulation of consumer protection in general and of the banking and insurance industries in particular.' " (*Ibid.*; see also *McClellan v. Chipman* (1896) 164 U.S. 347, 356-357 [41 L.Ed. 461, 17 S.Ct. 85]; *Peatros v. Bank of America* (2000) 22 Cal.4th 147, 159 [91 Cal.Rptr.2d 659, 990 P.2d 539]; *National State Bank, Elizabeth, N. J. v. Long* (3d Cir. 1980) 630 F.2d 981, 985 [banking is an area traditionally subject to dual federal and state control].)

There is a general presumption against preemption unless the state regulates in an area where there has been a "significant federal presence." (*Smith, supra,* 135 Cal.App.4th at p. 1475; *United States v. Locke* (2000) 529 U.S. 89, 108 [146 L.Ed.2d 69, 120 S.Ct. 1135].) In *Bank of America v. City & County of San Francisco* (9th Cir. 2002) 309 F.3d 551, 558–559, cities sought to regulate banks with ordinances to prohibit charging ATM fees to nondepositors. In that context, the Ninth Circuit declined to apply the general presumption against preemption because the field of banking is an area where there has been a significant federal presence. (See also *Barnett Bank of Marion City, N.A. v. Nelson* (1996) 517 U.S. 25, 28 [134 L.Ed.2d 237, 116 S.Ct. 1103] [federal statute authorizing national banks to sell insurance in small towns preempted a *conflicting* Florida law that forbid such sales].)

In the recent *Smith* case, the claims did not involve state or local laws that targeted banks or sought to regulate banking. In that context, the court imposed the burden of showing that specific state law claims were preempted on the party claiming preemption "because preemption of state laws by federal law or regulation generally is not favored." (*Smith, supra,* 135 Cal.App.4th at pp. 1475–1476.) The *Smith* court therefore "narrowly construe[d] the precise language of the federal . . . regulation to determine whether a particular state law claim [was] preempted. [Citations.] 'As to each state law claim, the central inquiry [was] whether the legal duty that is the predicate of the [claim] constitute[d] a requirement or prohibition of the sort that federal law expressly preempt[ed].' " (*Id.* at p. 1476.) Like the *Smith* court, we narrowly construe the OCC regulations to determine whether appellants' claims are preempted.

## III

### *Federal Banking Laws and Regulations*

■   The National Bank Act (NBA) grants national banking associations (e.g., Santa Barbara and other bank respondents) "all such incidental powers as shall be necessary to carry on the business of banking" by receiving deposits and making loans. (12 U.S.C. § 24.) "As the administrator charged

with supervision of the [NBA] [citations], the [OCC] bears primary responsibility for surveillance of 'the business of banking' authorized by [title 12 United States Code section 24 (Seventh)]." (*NationsBank of N. C., N.A. v. Variable Annuity Life Ins. Co.* (1995) 513 U.S. 251, 256 [130 L.Ed.2d 740, 115 S.Ct. 810].)

In January 2004, the OCC published a final rule amending part 7 of its regulations to add provisions "clarifying the applicability of state law to national banks' operations. The provisions concerning preemption identify [the] types of state laws that are preempted, as well as the types of state laws that generally are not preempted, with respect to national banks' lending, deposit-taking, and other operations." (69 Fed.Reg. 1904 (Jan. 13, 2004).) The trial court concluded that three of these regulations (the visitorial powers, deposit-taking and non-real-estate-lending regulations), which became effective February 12, 2004, expressly preempted appellants' claims.

The visitorial powers regulation provides that "[s]tate officials may not exercise visitorial powers with respect to national banks . . . except in limited circumstances authorized by federal law." (§ 7.4000(a)(1).) Visitorial powers include conducting examinations and inspections of national bank records and prosecuting enforcement actions. (§ 7.4000(a)(3).)

■ The deposit-taking regulation and the non-real-estate-lending regulation have parallel provisions. For example, each regulation provides that, except where made applicable by federal law, "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized deposit-taking [or non-real-estate-lending] powers are not applicable to national banks." (§ 7.4007(b)(1); see § 7.4008(d)(1).)

The deposit-taking regulation also provides that "[a] national bank may exercise its deposit-taking powers without regard to state law limitations concerning: [¶] . . . [¶] . . . Disclosure requirements." (§ 7.4007(b)(2)(iii).) Similarly, the non-real-estate-lending regulation provides that "[a] national bank may make non-real estate loans without regard to state law limitations concerning: [¶] . . . [¶] . . . The ability of a creditor to require . . . risk mitigants, in furtherance of safe and sound banking practices; [¶] . . . [¶] . . . [t]he terms of credit . . . ; [¶] . . . [¶] . . . [s]ecurity property, including leaseholds; [¶] . . . [¶] . . . [and] [d]isclosure and advertising." (§ 7.4008(d)(2)(ii), (iv), (vi), (viii).)

■ Both the deposit-taking regulation and the non-real-estate-lending regulation "save" or "exempt" certain state laws (including contracts, tort, and debt collection laws) from preemption. These exemptions apply to the extent that such laws only incidentally affect the exercise of national banks'

deposit-taking (or non-real-estate-lending) powers or are otherwise consistent with the banks' deposit-taking (or non-real-estate-lending) powers. (See §§ 7.4007(c)(1), (2), (4), 7.4008(e)(1), (2), (4).) These exemptions are sometimes called "savings clauses" or "catch-all" provisions.[5]

## IV.

*Appellants' State Law Claims*

The proposed plaintiff class is composed of all persons who at any time from March 18, 1999, forward, will have or have had their tax refunds seized by Santa Barbara as a result of the RAL procedures and collection methods challenged in the complaint. Appellants bring the class action as private attorneys general pursuant to the UCL, seeking a declaration that Santa Barbara's seizure of refunds for debt collection purposes without consumers' voluntary and knowing consent, and the contract provision permitting such debt collection are unlawful, unfair, deceptive and unenforceable. Appellants also seek orders enjoining Santa Barbara from such seizure of refunds and from engaging in an unlawful, deceptive and unfair debt collection practice. (Bus. & Prof. Code, §§ 17200, 17203, 17204.)

### A. *The Rosenthal Fair Debt Collection Practices Act Claims*

Appellants allege that respondents violated the Rosenthal Fair Debt Collection Practices Act by failing to inform consumers that Santa Barbara would engage in debt collection practices during the loan application and approval process and by falsely representing the nature of their services and failing to include certain legally mandated debt collection notices. (Civ. Code,

---

[5] The dissent relies upon *Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374, 385 [119 L.Ed.2d 157, 112 S.Ct. 2031], in asserting that the OCC regulations' general savings clauses do not control over the OCC's more specific express preemption regulations. While *Morales* does provide that "[a] general 'remedies' saving clause cannot be allowed to supersede the specific substantive pre-emption provision," Morales does not apply to this case. *Morales* considered a wholly distinct issue involving a preemption statute within the Airline Deregulation Act of 1978 by which Congress itself had clearly and directly provided that states could not enforce any laws relating to air carriers' rates, routes or services. (*Id.* at pp. 378–379.) We are not interpreting a congressional act providing for the preemption of state law. In contrast, we are reviewing the application of regulations adopted by the OCC by which the OCC presumes to declare when state law is preempted by its own regulations, without any grant of field preemption from Congress with respect to laws governing national banks. (Congress has not granted the OCC an exclusive regulatory "cradle to grave" authority under the NBA, in contrast to the exclusive authority that it granted to the Office of Thrift Supervision (OTS) under the Home Owners' Loan Act (HOLA). (*Fidelity Federal S. & L. Assn. v. de la Cuesta* (1982) 458 U.S. 141, 145, 166–167 [73 L.Ed.2d 664, 102 S.Ct. 3014].) Further, for reasons we later explain, we conclude that the "express" preemption regulations (deposit-taking and non-real-estate-lending) do not preempt appellants' claims.

§§ 1788 et seq., 1788.13, subd. (i).) Appellants seek actual damages, penalty damages of at least $1,000 per violation, and fees, costs, and expenses. (Civ. Code, § 1788.30, subd. (c).)

### B. *The CLRA Claims*

Appellants seek injunctive relief and damages pursuant to the CLRA (Civ. Code, § 1750 et seq.), which they allege respondents violated by representing that RAL's are a form of tax refund "when they are loans subject to seizure by the lender to pay off alleged prior RAL debts of individual taxpayers." (See Civ. Code, § 1770, subd. (a)(5), (14).) Appellants also allege that respondents violated the CLRA by representing that they have rights and remedies that are prohibited by law, i.e., the right to collect a third party debt without providing notices required by law. In addition, appellants allege that respondents violated the CLRA by including the one-sided, unlawful, unfair, fraudulent and unconscionable "cross-lender debt collection provision" (cross-collection provision) in their RAL application and that the RAL application is an adhesion contract which is offered on a "take-it-or-leave-it basis." (See Civ. Code, § 1770, subd. (a)(19).) Appellants further allege that the cross-collection provision substantially deprives them and other consumers of their tax refunds without their voluntary, knowing, and intelligent consent, and that it consequently is unlawful, unfair, fraudulent, and unconscionable. Appellants seek actual and punitive damages against Santa Barbara pursuant to Civil Code sections 1770 and 1780, as well as injunctive relief, restitution, costs, etc.

### C. *The UCL Claim*

Appellants seek injunctive relief, restitution, and monetary damages under the UCL because respondents' cross-collection practice violates the Rosenthal Fair Debt Collection Practices Act, the CLRA, offends public policy, is unlawful, unfair, and fraudulent, as well as unconscionable, oppressive, and unscrupulous. (Bus. & Prof. Code, § 17203.) Appellants further allege that respondents deceive and mislead consumers by inducing them to sign RAL agreements containing the cross-collection provision because consumers are not clearly and effectively informed about the existence and effect of that provision. (Bus. & Prof. Code, § 17200 et seq.) Appellants' causes of action under the UCL and the CLRA are based on the same predicate acts.

### D. *The Conversion Claim*

Hood and similarly situated class members seek actual and punitive damages from Santa Barbara for conversion, alleging that respondents had no valid contract with these class members because they rejected their RAL applications and did not give them any Accelerated Check Refunds.

## THE TRIAL COURT INCORRECTLY CONCLUDED THAT FEDERAL REGULATIONS PREEMPTED APPELLANTS' CLAIMS

*The Visitorial Powers Doctrine Does Not Preempt*
*Appellants' Claims Because Private Parties' Actions Are Not*
*"Visitations"*

The trial court concluded that appellants sought "state court regulation and supervision of the exercise of national [banking] powers." It further concluded that the "visitorial powers doctrine . . . precludes [appellants'] claims that are brought on behalf of a class or the general public," citing title 12 United States Code section 484(a) and 12 Code of Federal Regulations section 7.4000(a). We disagree.

██ The visitorial powers doctrine applies to government actions. That doctrine provides that no national bank "shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress . . . ." (12 U.S.C. § 484(a).) Visitorial powers include regulating and supervising activities permitted pursuant to federal banking law (e.g., examinations and inspections of bank records) and enforcing compliance with any applicable federal or state laws concerning those activities. (§ 7.4000(a).)

Historically, the "visitations" prohibited by the visitorial powers doctrine involve the act of a government. (See, e.g., *Guthrie v. Harkness* (1905) 199 U.S. 148, 158–159 [50 L.Ed. 130, 26 S.Ct. 4] [which describes the right of visitation as "a public right, existing in the State for the purpose of examining . . . the conduct of the corporation"].) "Because 'visitation' assumes the act of a sovereign body, private actions brought by individuals against banks in pursuit of personal claims ordinarily are outside the scope of visitorial powers rules." (69 Fed.Reg. 1895-01, 1899, fn. 30 (Jan. 13, 2004) [OCC's Final Rule Action, "Bank Activities and Operations"].) The language of the OCC's visitorial powers regulation explicitly contemplates state action: "State officials may not exercise visitorial powers with respect to national banks . . . except in limited circumstances authorized by federal law." (§ 7.4000(a)(1).)

Appellants brought their action as private parties seeking damages for financial losses as well as declaratory and injunctive relief under the "private attorneys general" statute. As the California Supreme Court recognized in *People v. Pacific Land Research Co.* (1977) 20 Cal.3d 10, 17–19 [141 Cal.Rptr. 20, 569 P.2d 125], there are fundamental differences between an action filed by a public prosecutor seeking injunctive relief and civil penalties

and a consumer class action filed by a private party. (See also *Payne v. National Collection Systems, Inc.* (2001) 91 Cal.App.4th 1037, 1045 [111 Cal.Rptr.2d 260].) The "filing of a UCL [class] action by a private plaintiff does not confer on that plaintiff the stature of a prosecuting officer, and the fact that the plaintiff may be acting as a so-called private attorney general is irrelevant . . . ." (*Net2Phone, Inc. v. Superior Court* (2003) 109 Cal.App.4th 583, 587 [135 Cal.Rptr.2d 149].) (The Attorney General's only role in this action has been the filing of an amicus curiae brief with this court.) Actions brought by private plaintiffs are outside the scope of the visitorial powers regulation.

In discussing visitorial powers, the trial court concluded that appellants' action is fundamentally regulatory. "[T]he purpose of [appellants'] action is to regulate cross-collection agreements, not to adjudicate an individual dispute." We do not agree that by permitting appellants' claims to proceed, the state is regulating Santa Barbara's conduct. Appellants' ability to sue respondents under the UCL, under the CLRA, for conversion, and for violating debt collection laws does not interfere with what respondents may do or how they may operate their banking business. Put another way, while the state cannot dictate to respondents how they can or cannot operate, it can insist that, however respondents choose to operate, they do so without violating debt collection laws and using deceptive business practices. (See *Fenning v. Glenfed, Inc.* (1995) 40 Cal.App.4th 1285, 1299 [47 Cal.Rptr.2d 715].)

Appellants seek not only declaratory and injunctive relief but also the recovery of damages for class members under several theories. Appellants allege class members suffered substantial economic losses as a result of respondents' seizures of their tax refunds. The visitorial powers doctrine does not preclude appellants from pursuing their claims.[6]

### The OCC's Deposit-taking and Lending Regulations Do Not Preempt State Tort, Contract, or Debt Collection Laws Unless These Laws More Than Incidentally Affect the Exercise of the Banks' Authorized Powers

Both the deposit-taking regulation and the lending regulation "exempt" or "save" state contract, tort, and debt collection laws from preemption. These exemptions apply to the extent that such laws only incidentally affect the exercise of national banks' deposit-taking (or non-real-estate-lending) powers

---

[6] Because the visitorial powers doctrine does not apply to appellants' claims, we do not address whether the claims fall within the "courts of justice exception." Nor do we address whether the OCC lacked authority to promulgate section 7.4000 (concerning the visitorial powers doctrine), which the Attorney General asserts "purports to . . . prevent state officials from enforcing a variety of . . . laws against national banks."

or are otherwise consistent with the banks' deposit-taking (or non-real-estate-lending) powers. (See §§ 7.4007(c)(1), (2), (4), 7.4008(e)(1), (2), (4).)[7] Based on the record before us, it does not appear that the state's contract, tort or debt collection laws have more than an incidental effect on the exercise of national banks' deposit-taking (or non-real-estate-lending) powers or are otherwise inconsistent with the banks' deposit-taking (or non-real-estate-lending) powers.[8]

█   California's debt collection law, the Rosenthal Fair Debt Collection Practices Act, does not have more than an incidental effect on respondents. Federal courts recognize that national banks and federally regulated thrift organizations are subject to state laws governing debt collection. (See *Bank of America v. City & County of San Francisco, supra,* 309 F.3d at p. 559; *Alkan v. Citimortgage, Inc.* (N.D.Cal. 2004) 336 F.Supp.2d 1061, 1064.) " '[S]tates retain some power to regulate national banks in areas such as contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law.' " (*Wells Fargo Bank N.A. v. Boutris* (9th Cir. 2005) 419 F.3d 949, 963, 970.) Appellants' claims seeking relief under state contract, tort or debt collection are not preempted by federal law.

### *The Deposit-taking and Non-real-estate-lending Regulations Do Not Preempt Claims That Are Based on Federally Grounded Obligations*

In *Smith, supra,* 135 Cal.App.4th 1463, the court held that the OCC's deposit-taking regulation did not preempt Smith's UCL or CLRA causes of

---

[7] In *Smith, supra,* 135 Cal.App.4th 1463, Smith had asserted that the deposit-taking regulation (§ 7.4007(b)(2)) should not be applied retroactively to preempt cases based on conduct predating its February 12, 2004, effective date. The trial court adopted the OCC's position that because the deposit-taking regulation was a " 'clarification of existing law,' " it could be given retroactive effect. (*Smith,* at p. 1470.) The Court of Appeal decided the case without addressing this issue. (*Id.* at p. 1482, fn. 17.) Appellants' action challenges conduct that predates the OCC preemption regulations, as well as similar, ongoing conduct.

[8] The trial court did not "rely on [the declaration submitted by respondents to establish] more than an incidental effect" and did not allow appellants to conduct "further discovery to respond to that evidence" because it "would not effect the court's decision." The dissent concludes that appellants' class action "[b]y any standard [would have] more than an incidental impact on the banks' deposit-taking and non-real-estate-lending powers," as it would regulate the terms under which national banks make and collect on RAL's and the manner in which they conduct business with other national banks. (Dis. opn., *post,* at p. 551.)

For reasons previously explained, we reject the argument that a private action such as appellants' is regulatory. Further, if the judgment in this case were sustained on the ground that appellants' pursuit of their claims would have more than an incidental effect on respondents' exercise of its authorized powers without requiring the consideration of evidence from the parties relevant to such effect, it seems that national banks could avoid state law compliance and state court process in nearly any case.

action, which were partially based on Wells Fargo's violation of federal law (specifically, the OCC disclosure regulations). Because Smith's UCL cause of action was not based on an alleged violation of a *state* law requiring (or limiting) certain disclosures by Wells Fargo, the court concluded that it was not preempted by the deposit-taking regulation. (*Id.* at pp. 1482, 1487.)

Some of the legal obligations that appellants seek to enforce are created by federal law. Appellants seek to redress the violation of federal standards that have been adopted as part of California law. For example, appellants allege that respondents violated Civil Code section 1788.17, part of the Rosenthal Fair Debt Collection Practices Act, which requires debt collectors to comply with the federal Fair Debt Collection Practices Act. In addition, title 12 United States Code section 4302(e) prohibits depository institutions from making "any advertisement, announcement, or solicitation relating to a deposit account that is inaccurate or misleading or that misrepresents its deposit contracts." Appellants allege that "[d]efendants deceive and mislead consumers when they induce consumers to sign RAL Agreements containing the [cross-collection provision]"; that defendants have violated Civil Code section 1770, subdivision (a)(5) because they have represented that the RAL's are a form of tax refund when they are loans subject to seizure by the lender to pay off alleged prior RAL debts of individual taxpayers; and that they have violated Civil Code section 1770, subdivision (a)(14) by representing that they have rights and remedies that are prohibited by law. The facts alleged in the complaint support a legal theory of liability for false and misleading advertising based on the predicate act(s) of violation of federal law regarding required disclosures and prohibited misleading or misrepresentative advertising. (See *Smith, supra,* 135 Cal.App.4th at pp. 1487–1488.) Further, title 15 United States Code section 1692e provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." The complaint's alleged facts would support a legal theory of liability for violation of section 1692e also.

■ An act or practice is "unfair competition" under the UCL if it is forbidden by law. (*Smith, supra,* 135 Cal.App.4th at pp. 1479–1480.) The UCL "borrows" violations of other laws, including federal laws, and makes them actionable as unlawful business practices. (See *id.* at p. 1480 and authorities cited therein.) Therefore, a violation of federal law may serve as a predicate for a UCL action. (*Ibid.*) ■ The OCC has recognized that the UCL applies to national banks.[9]

[9] "Unfair or deceptive acts or practices are unlawful under federal and state law." (OCC Advisory Letter 2002-3 (Mar. 22, 2002) p. 3, available online at <http://www.occ.treas.gov/ftp/advisory/2002-3.doc> [as of Sept. 28, 2006].) "A number of state laws prohibit unfair or deceptive acts or practices, and such laws may be applicable to insured depository institutions. See, e.g., [Bus. & Prof. Code, §§ ] 17200 et seq. and 17500 et seq." (*Id.* at p. 3, fn. 2, italics

The *Smith* court concluded that Smith's UCL cause of action "only 'incidentally affect[ed]' [the bank's] deposit-taking powers" because Smith's UCL cause of action in effect was "a tort cause of action based on alleged violations of federal disclosure requirements applicable to Bank regardless of the UCL." (*Smith, supra,* 135 Cal.App.4th at p. 1483.) The court further reasoned that it could not be "reasonably . . . [or] persuasively, argued that Smith's UCL cause of action based on alleged violations of OCC disclosure requirements involves a state law that 'obstruct[s], impair[s], or condition[s]' [the bank's] ability to fully exercise its deposit-taking powers." (*Ibid.,* citing § 7.4007(b)(1).) The court applied similar reasoning to Smith's CLRA cause of action and concluded that neither his UCL nor his CLRA causes of action were preempted. (135 Cal.App.4th at pp. 1483, 1486–1487.)

■ State laws redressing violations of federal law are not preempted even where those laws offer additional remedies. (See, e.g., *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 495 [135 L.Ed.2d 700, 116 S.Ct. 2240].) The federal Fair Debt Collection Practices Act expressly protects from preemption state laws that provide greater consumer protection than does the federal law. (15 U.S.C. § 1692n.) "Ordinarily, 'state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law.' " (*Washington Mutual Bank v. Superior Court* (1999) 75 Cal.App.4th 773, 782 [89 Cal.Rptr.2d 560].)[10]

■ The relevant OCC regulations preempt those state laws that "obstruct, impair, or condition" a national bank's ability to exercise its federally authorized deposit-taking and lending powers. (§§ 7.4007(b)(1), 7.4008(d)(1).) Here, appellants' CLRA, UCL, and Rosenthal Fair Debt

---

omitted.) See "*Gibson v. World Savings & Loan Assn., supra,* 103 Cal.App.4th at pp. 1306–1307 [UCL claim against federal savings association based on violation of [OTS] regulations . . . was not preempted]; *Fenning v. Glenfed, Inc.*[, *supra,*] 40 Cal.App.4th at [pp.] 1289, 1299 . . . [UCL action against federal savings and loan association based on violation of OTS regulations was not preempted]; *Lopez v. World Savings & Loan Assn.* (2003) 105 Cal.App.4th 729, 741–742 [130 Cal.Rptr.2d 42]. ['UCL remains available to remedy a myriad of potential unfair, unlawful, and fraudulent practices engaged in by federally chartered savings and loan associations, so long as the practice is outside the scope of federal regulation.']." (*Smith, supra,* 135 Cal.App.4th at p. 1479.)

[10] Respondents challenge appellants' ability to pursue their claims alleging a violation of federal law where they did not raise that theory below. That does not bar appellants' reliance on a federal law violation to support their UCL and CLRA theories. "[T]he test of the adequacy of a complaint is whether it alleges sufficient *facts* to support a particular cause of action and not whether it expressly alleges legal theories of liability underlying a cause of action. A complaint is adequate if its factual allegations are sufficient to support a cause of action on any available legal theory (whether specifically pleaded or not). [Citation.] . . . [T]o the extent [respondents] argue[] on appeal that [appellants] waived [their] violations of [federal law and other theories or liability under the UCL and CLRA] by not expressly raising those theories in [their] complaint, [respondents] misconstrue[] applicable California law . . . ." (*Smith, supra,* 135 Cal.App.4th at p. 1485.)

Collection Practices Act's causes of action allege facts that would support a cause of action based on violations of federal law that apply to respondents regardless of state law. Thus, those causes of action are not preempted because they do not impose any substantial limitations upon, or "obstruct, impair, or condition" a bank's actions. (See *Smith, supra*, 135 Cal.App.4th at pp. 1483–1487.)[11]

### *The OCC's Non-real-estate-lending Regulation Does Not Authorize Banks to Require Mitigants to Protect Third Party Creditors from Risk*

The trial court ruled that the national banks' ability to require cross-collection contracts as a risk mitigant or term of RAL credit was expressly preempted from state regulation and laws, in apparent reliance on section 7.4008(d)(2)(ii) and (iv). Respondents describe this section as "a primary ground" of the trial court's ruling.

The trial court's ruling gave an expansive interpretation to the "risk mitigants" permissible under the OCC's non-real-estate-lending regulation. The ruling enforced a risk mitigant (or term of credit) against Hood and in favor of respondents, including Santa Barbara, in a transaction where Santa Barbara extended no credit to Hood. Santa Barbara's seizure of Hood's 2001 tax refund alleviated a risk incurred by a third party (Household Bank) under a preexisting transaction. The trial court thus applied the non-real-estate-lending regulation to a transaction where Santa Barbara made no loan and incurred no risk.

We disagree with the trial court's expansive reading of the non-real-estate-lending regulation. As we have already indicated, we narrowly construe the precise language of the regulation. (*Smith, supra*, 135 Cal.App.4th at p. 1476.) The mitigation of risks of third parties is beyond the scope of the non-real-estate-lending regulation. That regulation encompasses a bank's (lender's) mitigation of its own risk with respect to its extension of credit to an individual borrower. The regulation refers to "[*a*] bank," "*a borrower's* ability to repay" (§ 7.4008(b), italics added), and "[*a*] *national bank*[*'s*]" authority to make loans without regard to state law limitations concerning

---

[11] In urging this court to uphold the trial court's ruling that the OCC regulations preempt state law, respondents stress that the RAL program involves an activity that has great federal interest. (E.g., RAL's are secured by a federal tax refund; the IRS deposits the refund electronically into an account at a national bank; IRS rules describe disclosure duties of tax preparers assisting taxpayers applying for RAL's; and certain components of the RAL program are protected by federal patents.) These factors do not control the issue of preemption.

"[t]he ability of *a creditor* to require . . . risk mitigants," or terms of credit. (§ 7.4008(d)(2)(ii), italics added.) This language does not expressly preempt state laws where banks use loan applications to seize consumers' tax refunds for the purpose of collecting the consumers' preexisting debts to third parties. Appellants' claims are outside the scope of preemption encompassed by the non-real-estate-lending regulation. (See *Gibson v. World Savings & Loan Assn., supra*, 103 Cal.App.4th at pp. 1301–1302, citing *Cipollone v. Liggett Group, Inc., supra*, 505 U.S. at p. 516.)

### The Non-real-estate-lending Regulation Does Not Preempt Claims of Class Members Who Received No Loans

Hood and similarly situated class members received no loans from Santa Barbara. Respondents nevertheless argue that the OCC's non-real-estate-lending regulations preempt their claims. We disagree. Santa Barbara has no lending relationship with appellants. Consequently, their claims against Santa Barbara and the laws upon which they base those claims are outside the scope of the non-real-estate-lending regulation.

In addition, respondents argue that "established principles of administrative law" require this court to "defer to the OCC's finding that national banks may participate in RAL cross-collection programs," and that to reach a contrary result "would directly obstruct the OCC's regulatory authority, in violation of longstanding preemption principles." In so arguing, respondents cite *Chevron U. S. A. v. Natural Res. Def. Council* (1984) 467 U.S. 837, 843–844 [81 L.Ed.2d 694, 104 S.Ct. 2778], and *Arkansas v. Oklahoma* (1992) 503 U.S. 91, 105–114 [117 L.Ed.2d 239, 112 S.Ct. 1046]. Respondents also cite recent federal appellate court decisions that uphold the OCC preemption regulations at issue here. We are not bound by lower federal appellate court decisions. (See *People ex rel. Renne v. Servantes* (2001) 86 Cal.App.4th 1081, 1090 [103 Cal.Rptr.2d 870]; *People v. Williams* (1997) 16 Cal.4th 153, 190 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

Admittedly, courts defer to administrative agencies concerning areas particularly within their expertise, as in *Arkansas v. Oklahoma, supra*, 503 U.S. at pages 105 through 114, where the court granted substantial deference to the EPA's interpretation of Oklahoma's water quality standards. Although respondents urge this court to give deference to the OCC regulations concerning the preemption of state law, respondents have not cited any controlling authority requiring a court to defer to an agency's regulations concerning preemption. The United States Supreme Court has declined to accord deference to an agency regulation purporting to preempt state law, stating it would "assume (without deciding) that the . . . question [of *whether* a statute is

preemptive] must always be decided *de novo* by the courts." (*Smiley v. Citibank (South Dakota), N.A.* (1996) 517 U.S. 735, 744 [135 L.Ed.2d 25, 116 S.Ct. 1730].)

Moreover, our decision does not prohibit national banks from participating in cross-collection programs that comply with relevant laws. Further, although the Attorney General has urged us to do so, we do not decide whether the OCC exceeded its authority in adopting the preemption regulations.[12]

Respondents refer to various materials in arguing that the OCC is aware of lenders' RAL cross-collection agreements.[13] We have examined those materials but find no clear indication that the OCC condones the use of cross-collection provisions by a "lender" who extends no credit to a consumer and seizes that consumer's tax refund to pay the proceeds to a third party lender for a preexisting RAL debt.

██ Because the trial court erred in concluding that federal law expressly preempted appellants' claims, we reverse the judgment and remand this matter to the trial court. Costs are awarded to appellants.

Perren, J., concurred.

**YEGAN, Acting P. J.**, Dissenting.—I respectfully dissent.

The effect of the majority's decision is to permit a trial court in California to exercise regulatory control over the conditions under which national banks make refund anticipation loans (RAL's) and, acting pursuant to cross-collection agreements with other national banks, apply tax refunds deposited into special accounts to satisfy balances due on RAL's made in prior tax years. Regulations adopted by the Office of the Comptroller of the Currency (OCC) preempt state laws that purport to regulate the deposit-taking and non-real-estate-lending activities of national banks. Here, appellants seek a state court injunction invalidating a federal banking practice approved by the

---

[12] The Attorney General notes that the "California Supreme Court has categorically rejected the OCC's [previous] attempts to preempt state law by regulatory command" in *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 932 [216 Cal.Rptr. 345, 702 P.2d 503]. The Attorney General further notes that Congress later referred to the *Perdue* case when it characterized the OCC's application of preemption principles as " 'inappropriately aggressive, resulting in preemption of State law in situations where the federal interest did not warrant that result.' "

[13] (See, e.g., OCC Interpretative Letter No. 959 (Feb. 13, 2003); OCC Corporate Decision No. 2005-11 (July 12, 2005) pp. 2–3 [application to merge First Bank of San Luis Obispo] at <http://www.occ.treas.gov/interp/aug05/cd05-11.doc> [as of Sept. 28, 2006]; OCC CRA Decision 129 (Nov. 3, 2005) pp. 1–5 [decision re HSBC Bank Nevada, N.A. application to merge, etc.] at <http://www.occ.treas.gov/interp/dec05/crad129.doc> [as of Sept. 28, 2006].)

OCC. In my view, the majority should stay out of the federal banking business. Because the trial court correctly concluded that appellant's claims are preempted by federal law, I would affirm.

The majority errs, in my view, when it applies a presumption *against* preemption. This is a dispute over the performance of contracts by and between federally regulated national banks. As the United States Supreme Court has noted, the presumption against preemption is "not triggered when the State regulates in an area where there has been a history of significant federal presence." (*United States v. Locke* (2000) 529 U.S. 89, 108 [146 L.Ed.2d 69, 88, 120 S.Ct. 1135].) National banking has been the subject of federal legislation and regulation for more than a century. "Indeed, since the passage of the National Bank Act in 1864, the federal presence in banking has been significant." (*Bank of America v. City & County of San Francisco* (9th Cir. 2002) 309 F.3d 551, 558; see also *Barnett Bank of Marion Cty., N.A. v. Nelson* (1996) 517 U.S. 25, 32 [134 L.Ed.2d 237, 116 S.Ct. 1103] [noting federal courts' history of interpreting statutory grants of authority to national banks as "not normally limited by, but rather ordinarily pre-empting, contrary state law."].)[1] As a consequence, "the usual presumption against federal preemption of state law is inapplicable to federal banking regulation." (*Wells Fargo Bank N.A. v. Boutris* (9th Cir. 2005) 419 F.3d 949, 956.) We should presume that state laws *are* preempted and that respondents' obligations to RAL borrowers are defined by the federal regulations.

With respect to non-real-estate-lending, the federal regulations expressly preempt state laws purporting to regulate "terms of credit," "disbursements and repayments," "impound accounts, and similar accounts" and "[s]ecurity property." (12 C.F.R. § 7.4008(d)(2)(iv), (ix), (v), (vi) (2006).) Appellants challenge the terms under which respondents make short term loans that are secured by the borrower's expected tax refund, and respondents' seizure of tax refund checks from specially created, temporary bank accounts to repay similar loans made by other national banks in prior tax years. Their claims fall squarely within the categories of claims expressly preempted by federal law.

---

[1] The OCC reached the same conclusion in its commentary on the adoption of the final rules at issue here, noting that "there is no presumption against preemption in the national bank context." (Bank Activities and Operations, 69 Fed.Reg. 1895, 1896 (Jan. 13, 2004).) Congress expressly charged the OCC with the regulation of national banks. We should defer to its reasonable interpretation of the preemptive scope of that legislative mandate. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568 [59 Cal.Rptr.2d 186, 927 P.2d 296]; see also *Presley v. Etowah County Com'n* (1992) 502 U.S. 491, 508 [117 L.Ed.2d 51, 112 S.Ct. 820]; *Ford Motor Credit Co. v. Milhollin* (1980) 444 U.S. 555 [63 L.Ed.2d 22, 100 S.Ct. 790].)

The OCC deposit-taking regulations also authorize national banks to employ special purpose savings services "without regard to state law limitations." (12 C.F.R. § 7.4007(b)(2)(vii)(2006).) The RAL process involves the creation of a special purpose savings account to receive the tax refund. State laws purporting to limit the terms under which those savings accounts are created or managed are expressly preempted.

Appellant's claims are not preserved by the "saving clauses" included in both the deposit-taking and non-real-estate-lending regulations. (12 C.F.R. §§ 7.4007, subd. (c), 7.4008, subd. (e)(2006).)[2] These general savings clauses do not control over the more specific express preemption regulations. "A general 'remedies' saving clause cannot be allowed to supersede the specific substantive pre-emption provision . . . ." (*Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374, 385 [119 L.Ed.2d 157, 168, 112 S.Ct. 2031].)

Moreover, each saving clause provides that state laws may "apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit taking [or non-real-estate-lending] powers." (12 C.F.R. § 7.4007, subd. (c) (2006); see *id.*, § 7.4008, subd. (e)) State laws "incidentally affect" a national bank when they are laws of general application that "are not designed to regulate lending and do not have a disproportionate or otherwise substantial effect on lending. To the contrary, they are part of the legal infrastructure that undergird all contractual and commercial transactions." (*Gibson v. World Savings & Loan Assn.* (2002) 103 Cal.App.4th 1291, 1303–1304 [128 Cal.Rptr.2d 19].)

Here, appellants are using state laws of general application, including the common law tort of conversion, the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) and the Rosenthal Fair Debt Collection Practices Act (Civ. Code, § 1788 et seq.), to enjoin a national bank from performing under its cross-collection agreements with other national banks. This is more than an individual claim for money damages based on a breach of contract or tort. It is a class action that seeks to regulate not only the terms under which national

---

[2] The savings clauses provide: "State laws on the following subjects are not inconsistent with the deposit-taking [or non-real-estate-lending] powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit-taking [or non-real-estate-lending] powers: (1) Contracts; [¶] (2) Torts; [¶] (3) Criminal law; [¶] (4) Rights to collect debts; [¶] (5) Acquisition and transfer of property; [¶] (6) Taxation; [¶] (7) Zoning; and [¶] (8) Any other law the effect of which the OCC determines to be incidental to the deposit-taking [or non-real-estate-lending] operations of national banks or otherwise consistent with the powers set out in paragraph (a) of this section." (12 C.F.R. § 7.4007, subd. (c) (2006), fn. omitted; see § 7.4008, subd. (e) (2006).)

banks make and collect on RAL's, but also the manner in which they conduct business with other national banks. The remedy sought by appellants would dictate the terms under which national banks make RAL's and would vitiate their cross-collection agreements. By any standard, that is more than an incidental impact on the banks' deposit-taking and non-real-estate-lending powers. As a result, appellants' claims fall outside the regulations' savings clauses. The trial court correctly recognized this and found appellants' claims expressly preempted by the OCC regulations. Its judgment should be affirmed.

A petition for a rehearing was denied October 26, 2006, and respondents' petition for review by the Supreme Court was denied January 3, 2007, S147931. Werdegar, J., and Corrigan, J., did not participate therein.