[No. A120206. First Dist., Div. Two. Oct. 22, 2008.]

CHARLES FONSECA, Plaintiff and Appellant, v.
HEATHER J. FONG, as Chief, etc., et al., Defendants and Respondents;
SAN FRANCISCO POLICE DEPARTMENT, Real Party in Interest and
Respondent.

## COUNSEL

Judicial Watch, Inc., Sterling Ernie Norris, Paul J. Orfanedes, James F. Peterson; Law Offices of David Klehm and David Klehm for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, and Wayne K. Snodgrass, Deputy City Attorney, for Defendants and Respondents and for Real Party in Interest and Respondent.

## OPINION

**KLINE, P. J.**—Section 11369 of the Health and Safety Code (Section 11369) states that "[w]hen there is reason to believe that any person arrested for a violation [of any of 14 specified drug offenses[1]] may not be a citizen of the United States, the arresting agency shall notify the appropriate agency of the United States having charge of deportation matters."[2]

---

[1] Namely, those described in sections 11350, 11351, 11351.5, 11352, 11353, 11355, 11357, 11359, 11360, 11361, 11363, 11366, 11368 or 11550 of the Health and Safety Code.

[2] As originally enacted in 1939 as part of the omnibus measure creating the Health and Safety Code, as section 11715.5 thereof, the statute stated that "Any person not a citizen of the United States of America who is *convicted* of violating [four specified sections of the Health and Safety Code], or of committing any offense referred to in those sections shall be reported to the appropriate agency of the United States having charge of deportation matters. [¶] *The certificate shall be issued by the court in which the conviction takes place, shall recite the facts of the case, and recommend that the defendant be deported.*" (Stats. 1939, ch. 1097, p. 3026; *id.*, ch. 60, p. 772, italics added.) The language of the statute was amended to its present form in 1953. (Stats. 1953, ch. 1770, § 9, p. 3527.) All subsequent amendments (Stats. 1954, 1st Ex. Sess., ch. 12, § 2, p. 259; Stats. 1959, ch. 1112, § 12, p. 3196; Stats. 1991, ch. 573, § 2, p. 2689) simply increased the number of drug offenses for which an arrest triggers the notification requirement. The language of the statute was moved from section 11715.5 of the Health & Safety Code to section 11369 of that code in 1972. (Stats. 1972, ch. 1407, § 3, pp. 2987, 3019.)

Claiming the San Francisco Police Department (SFPD) "disregards" the mandate of this statute, Charles Fonseca (appellant), a taxpayer and resident of San Francisco, filed this petition for a writ of mandate commanding that Heather J. Fong, Chief of the SFPD, and the members of the San Francisco Police Commission, and the SFPD as real party in interest (collectively respondents), all comply with Section 11369.

Respondents demurred to the petition, claiming appellant has not and cannot state a cause of action inasmuch as Section 11369 is an unlawful state immigration law per se preempted by the exclusivity of the federal government's constitutional power to regulate in this area. After issuing an order agreeing with respondents that the statute was per se preempted and sustaining the demurrer without leave to amend, the trial court dismissed the petition and entered judgment in favor of respondents.

We shall reverse the judgment and remand for further proceedings.

### FACTS AND PROCEEDINGS BELOW

On March 21, 2007, prior to the commencement of this action, appellant's counsel filed a request under the California Public Records Act (Gov. Code, § 6250 et seq.) seeking, among other things, records or other documentation indicating (1) the number of persons arrested by the SFPD for violations of the 14 drug offenses specified in Section 11369 during the past five years, (2) the number of such arrestees born outside the United States or otherwise suspected of being foreign nationals, (3) the number of SFPD contacts with federal immigration authorities regarding such arrestees, and (4) "any and all written policies, manuals or any other form of documentation" indicating the SFPD's training of officers for compliance with Section 11369 during the past five years. A representative of the SFPD responded in writing that the requested information could not be provided because the "SFPD does not track incidents in the manner you request."[3]

The petition, which contains but one cause of action and seeks a writ of ordinary mandate (Code Civ. Proc., §§ 1085, 526a), was filed on May 4, 2007. Its chief allegation, that respondents and the SFPD unlawfully "disregard" Section 11369, is primarily based on a 2005 study by the federal Government Accountability Office (GAO)[4] and a 2007 report of the United

---

[3] This response ignores the fact that, as will be seen, the SFPD has a written policy, set forth in a Departmental General Order, regarding compliance with Section 11369 (see discussion, *post*, at p. 928, fn. 8) and there appears to have been no justification for SFPD's failure to provide it.

[4] GAO, Information on Certain Illegal Aliens Arrested in the United States, GAO-05-646R (Apr. 2005) (GAO Report 05-646R).

States Department of Justice (DOJ)[5] of which the trial court took judicial notice. The GAO report concluded, among other things, that 24 percent of the 55,322 aliens incarcerated in federal, state and local facilities during 2003 had been convicted of drug offenses, 97 percent of persons charged with unlawfully reentering this country had been previously arrested, and 50 percent of that group had been arrested for violent or drug-related offenses. (GAO Rep. 05-646R, *supra*, pp. 8–9.) Appellant attaches significance to these statistics apparently because he believes they support his allegation that the SFPD fails to comply with Section 11369, thereby enabling a significant number of drug offenders present in this country unlawfully to remain in San Francisco. According to the petition, the statistics set forth in the GAO report "clearly indicate that if the SFPD would comply with . . . [S]ection 11369, [appellant], and other residents of the City of San Francisco and citizens within the jurisdiction of the SFPD, would have a much lower chance of being victims of a violent crime committed by an illegal alien who was previously arrested for [one or more of the drug offenses specified] in . . . [S]ection 11369." The petition additionally maintains that compliance with Section 11369 would reduce municipal expenditures relating to the incarceration of many persons arrested for such offenses, and thereby benefit appellant and other taxpayers.

Appellant's claim that the SFPD fails to comply with Section 11369 also rests on the statement in the 2007 DOJ report that the San Francisco Field Office of Immigration and Customs Enforcement (ICE), a branch of the United States Department of Homeland Security, "has encountered difficulties in its attempt to expand the Criminal Alien Program (CAP)" in San Francisco due to the fact that administrators of the San Francisco County Jail "appear to have implemented a 'bare minimum of cooperation with ICE and the CAP to ensure they are compliant with state rules and the SCAAP regulations' " issued by DOJ. (DOJ Audit Rep. 07-07, *supra*, p. 10.)[6]

---

[5] DOJ, Office of the Inspector General, Cooperation of SCAAP Recipients in the Removal of Criminal Aliens from the United States, Audit Report 07-07 (Jan. 2007) (DOJ Audit Report 07-07). (SCAAP is an acronym for the State Criminal Alien Assistance Program, a federal program administered by the United States Attorney General under the authority of 8 U.S.C. § 1231(i).)

[6] Counsel for the parties advised us at oral argument that the San Francisco County Jail is administered by the San Francisco Sheriff, not by respondents or the SFPD. In *Gates v. Superior Court* (1987) 193 Cal.App.3d 205 [238 Cal.Rptr. 592] (*Gates*), the plaintiffs also complained about notification of federal authorities of the immigration status of detainees by the jail division of the Los Angeles Police Department (LAPD), although the majority of jails in Los Angeles County were not run by the LAPD but by the Los Angeles County Sheriff, who was not made a party to the case. The court solved the problem by noting that though it was not a party, the sheriff had a self-interest in complying with the court's ruling, and the court would adopt the assumption he would comply. (*Id.* at p. 211, fn. 1.) The parties invite us to adopt the same assumption with respect to the San Francisco Sheriff and we do so.

For the foregoing reasons, the petition alleges that the policies, procedures, and practices of the SFPD relating to Section 11369, "are unlawful and void, and the SFPD must be prohibited from expending any further taxpayer funds or taxpayer-financed resources to enforce, maintain, or otherwise carry out in any manner the aforementioned policies, procedures, and practices . . . ."[7]

Respondents demurred to the petition on the ground that Section 11369 cannot create the ministerial duty to notify the appropriate federal agency that it has reason to believe an arrestee may not be a citizen because the statute impermissibly invades an area of regulation within and preempted by exclusive federal authority. Although the demurrer effectively concedes the truth of appellant's allegation that the SFPD does not comply with Section 11369, and our review must assume the truth of all facts properly pleaded by appellant (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 [40 Cal.Rptr.3d 205, 129 P.3d 394]), respondents alternatively assert the separate defense that the SFPD complies with Section 11369.[8] The trial court found it unnecessary to address respondents' alternative argument because it found that Section 11369 was

---

[7] Appellant also relies upon a provision of the Immigration and Naturalization Act (INA) providing that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to . . . the Immigration and Naturalization Service [now ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (8 U.S.C. § 1373(a).) As we understand appellant's position it is that, as a practical matter, SFPD's official policy purporting to implement Section 11369 (which we describe presently) actually restricts compliance with that statute by SFPD officers. This argument involves factual issues not previously presented to and adjudicated by the trial court. We consider the foregoing provision of the INA only to the extent it bears upon whether Section 11369 is preempted. While, as we later explain, the federal statute is relevant to the question of preemption under some of the tests (see discussion, *post*, at p. 942), it is irrelevant to the question whether Section 11369 is per se preempted, as the trial court found, because a state law invading an area reserved exclusively to the federal government under the Constitution cannot be saved by a congressional enactment. (*De Canas v. Bica* (1976) 424 U.S. 351, 355 [47 L.Ed.2d 43, 96 S.Ct. 933] (*De Canas*); *Graham v. Richardson* (1971) 403 U.S. 365, 382 [29 L.Ed.2d 534, 91 S.Ct. 1848].)

[8] Respondents' alternative claim that they comply with the statute is apparently based, at least in part, on the SFPD's departmental general order No. 5.15 (Dec. 13, 1995) (DGO 5.15), the stated purpose of which "is to establish policies regarding the enforcement of immigration laws and cooperation with the Immigration and Naturalization Service (INS) [now ICE] in conformity with state and federal laws and the City of Refuge Ordinance, San Francisco Administrative Code Section 12H.2-1." DGO 5.15 declares that while it is the policy of the SFPD "to foster trust and cooperation with all people of this City and to encourage them to communicate with San Francisco police officers without fear of inquiry regarding their immigration status . . . [and also] to adhere to the City of Refuge Ordinance" (which ordinarily prohibits the use of city resources to assist in the enforcement of federal immigration laws) (DGO 5.15, § I.A), immigration status information may be released to federal authorities "[w]hen a person has been arrested for [one or more of the 14 offenses listed in Section 11369], and there is reason to believe that the person may not be a citizen of the United States." (DGO 5.15, § I.B.4.a.) The DGO also declares that "[s]uch belief cannot be based solely upon a person's inability to speak English or his/her 'foreign' appearance." (*Ibid.*)

per se preempted by the federal government's exclusive power to regulate immigration, and that appellant therefore "cannot show that [S]ection 11369 creates lawful ministerial duties on Respondents." It was solely on this ground that the court sustained the demurrer without leave to amend and thereupon dismissed the petition and entered judgment in favor of respondents, and that is the only basis upon which respondents ask us to affirm the judgment. We do not, of course, address the as yet unadjudicated factual question whether respondents and the SFPD comply with Section 11369.

## DISCUSSION

### I.

Our review of the sufficiency of a complaint against a general demurrer, which is de novo, is guided by long-settled rules. " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

"[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; accord, *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473]; *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980–981 [35 Cal.Rptr.2d 669, 884 P.2d 126].) Thus, our inquiry is not simply whether Section 11369 invades an area of regulation committed by the Constitution

---

Under DGO 5.15, a police officer may also inquire into an individual's immigration status or release such information to federal immigration authorities "[w]hen a person is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws," or "has previously been convicted of a felony committed in violation of the laws of the State of California which is still considered a felony under state law" or "the INS makes a request for information about [such] a person . . . ." (DGO 5.15, § I.B.4.b, c.)

exclusively to federal authorities and is therefore per se preempted, as the trial court found, but whether the statute may be declared preempted for any other reason.

## II.

█ .The United States Constitution provides that the laws of the United States "shall be the supreme law of the land; . . . any thing in the Constitution or laws of any state to the contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) Since the decision in *McCulloch v. Maryland* (1819) 17 U.S. 316, 427 [4 L.Ed. 579], "it has been settled that state law that conflicts with federal law is 'without effect.' [Citation.]" (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608].) There is ordinarily a "strong presumption" against preemption. (*Cipollone*, at p. 523; but see ·*Preston v. Ferrer* (2008) 552 U.S. ___ [169 L.Ed.2d 917, 128 S.Ct. 978]; *Rowe v. New Hampshire Motor Transp. Assn.* (2008) 552 U.S. ___ [169 L.Ed.2d 933, 128 S.Ct. 989]; *Riegel v. Medtronic, Inc.* (2008) 552 U.S. ___ [169 L.Ed.2d 892, 128 S.Ct. 999]; *Chamber of Commerce of United States v. Brown* (2008) 554 U.S. ___ [171 L.Ed.2d 264, 128 S.Ct. 2408].) "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' [Citation.] Accordingly, ' "[t]he purpose of Congress is the ultimate touchstone" ' of pre-emption analysis. [Citation.]" (*Cipollone*, at p. 516.) However, when the state regulates in an area where there has been a history of significant federal presence the " 'assumption' of nonpre-emption is not triggered . . . ." (*United States v. Locke* (2000) 529 U.S. 89, 108 [146 L.Ed.2d 69, 120 S.Ct. 1135].)

█ Federal authority to regulate immigration derives from various sources, including the federal government's power "[t]o establish [a] uniform rule of naturalization" (U.S. Const., art. I, § 8, cl. 4), its power "[t]o regulate commerce with foreign nations" (*id.*, cl. 3), and its broad authority over foreign affairs. (*Toll v. Moreno* (1982) 458 U.S. 1, 10 [73 L.Ed.2d 563, 102 S.Ct. 2977].) Thus, the Supreme Court has established that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." (*De Canas, supra,* 424 U.S. 351, 354; accord, *Hines v. Davidowitz* (1941) 312 U.S. 52, 62 [85 L.Ed. 581, 61 S.Ct. 399]; *Galvan v. Press* (1954) 347 U.S. 522, 531 [98 L.Ed. 911, 74 S.Ct. 737]; *Truax v. Raich* (1915) 239 U.S. 33, 42 [60 L.Ed. 131, 36 S.Ct. 7].) As the Supreme Court has repeatedly said, " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." (*Fiallo v. Bell* (1977) 430 U.S. 787, 792 [52 L.Ed.2d 50, 97 S.Ct. 1473], quoting *Oceanic Navigation Co. v. Stranahan* (1909) 214 U.S. 320, 339 [53 L.Ed. 1013, 29 S.Ct. 671].)

Nevertheless, not every state enactment or action "which [may] in any way deal[] with aliens is a regulation of immigration and thus *per se* pre-empted by this constitutional power, whether latent or exercised." (*De Canas, supra*, 424 U.S. at p. 355.) "[S]tanding alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." (*Ibid.*; see also *Takahashi v. Fish Comm'n.* (1948) 334 U.S. 410, 419 [92 L.Ed. 1478, 68 S.Ct. 1138] [states are granted no powers to determine "what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization"].) Thus, *De Canas* holds that a California statute prohibiting employers from knowingly employing aliens not lawfully residing in the United States was not preempted under the supremacy clause by the INA. (*De Canas*, at pp. 355–356.)

■ The *De Canas* court established a three-part test for determining whether a state statute relating to immigration is preempted by federal law. The initial inquiry is whether the state statute constitutes an attempted "regulation of immigration" that is per se preempted because of the exclusivity of federal power to regulate in this area under the United States Constitution. (*De Canas, supra*, 424 U.S. at p. 355.) If this is not the case, the statute may nevertheless be preempted under the second test, which is whether it was the " ' "clear and manifest purpose of Congress" ' " to effect a "complete ouster of state power—including state power to promulgate laws not in conflict with federal laws" (*id.* at p. 357) with respect to the subject matter of the state statute—because Congress intended to " 'occupy the field' " to which the state statute applies (*id.* at p. 357, fn. 5). Where the statute does not attempt to regulate immigration and applies to an area in which Congress did not intend to completely oust the states of power to regulate, the state statute may still be preempted under the third test, which is whether it " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in enacting the INA." (*Id.* at p. 363, quoting *Hines v. Davidowitz, supra*, 312 U.S. 52, 67, and *Florida Avocado Growers v. Paul* (1963) 373 U.S. 132, 141 [10 L.Ed.2d 248, 83 S.Ct. 1210]; see also *Michigan Canners & Freezers v. Agricultural Bd.* (1984) 467 U.S. 461, 469 [81 L.Ed.2d 399, 104 S.Ct. 2518].)[9]

---

[9] Though Section 11369 does not mandate state or local enforcement of the *criminal* provisions of the INA, it deserves to be noted that preemption principles do not bar state and local law enforcement officers from enforcing those provisions. Unlike the civil provisions of the INA, which are so comprehensive that no opportunity for state activity remains, the criminal provisions of the INA (8 U.S.C. §§ 1323–1328) are few and simple and it is settled that the federal government has not occupied the field of criminal immigration enforcement. (*Gonzales v. City of Peoria* (9th Cir. 1983) 722 F.2d 468, 475, overruled on other grounds in

The trial court found that Section 11369 failed the first *De Canas* test; that is, that the statute constitutes an impermissible state regulation of immigration preempted per se by the exclusivity of federal power to regulate in this area. Appellant urges us to reject that determination, and reverse the judgment, claiming Section 11369 does not in any way empower or require state or local law enforcement agencies to "determine" an arrestee's nationality or the lawfulness of his or her presence in the United States, let alone to set the standards by which an arrested person may remain in this country.

Respondents see the matter differently. They contend that, unlike the California statute upheld in *De Canas, supra*, 424 U.S. 351, which was designed "to protect California's fiscal interests and lawfully resident labor force from the deleterious effects on its economy resulting from the employment of illegal aliens" (*id.* at p. 357), Section 11369 was specifically designed to provide state assistance in the enforcement of federal immigration laws. The statute is preempted, respondents argue, because it "imposes classification and reporting requirements on local officials, with the obvious goal that suspected aliens will be reviewed by immigration authorities and possibly deported." As respondents see it, Section 11369 impermissibly compels state and local police officers to serve as "field agents" for federal authorities. The statute is ipso facto a state regulation of immigration, they say, because it forces state actors "to participate, in a supporting role, in 'the determination of who should or should not be admitted into the country.' "

The trial court adopted respondents' view, reasoning that Section 11369 invades exclusive federal power to regulate immigration because it effectively requires the SFPD "to act as an investigative arm of the federal deportation authorities." The trial court based its conclusion not only upon the analysis set forth in *De Canas*, but also, and more specifically, on that of the United States District Court for the Central District of California in *League of United Latin American Citizens v. Wilson* (C.D.Cal. 1995) 908 F.Supp. 755 (*LULAC*), the only case cited by the parties that examines whether a California statute compelling local authorities to assess and report on an

---

*Hodgers-Durgin v. de la Vina* (9th Cir. 1999) 199 F.3d 1037, 1040, fn. 1; *People v. Barajas* (1978) 81 Cal.App.3d 999 [147 Cal.Rptr. 195]; 3A Am.Jur.2d (2005) Aliens and Citizens, § 99; 3 Cal.Jur.3d (2008) Aliens and Citizens, § 16.) State and local law enforcement authorities may legally arrest a person for being in this country in violation of the criminal provisions of the INA (most commonly 8 U.S.C. §§ 1325 [improper entry by alien, a misdemeanor] and 1326 [improper reentry by removed alien, a felony]), provided only that such arrests are authorized by state law. (*Miller v. United States* (1958) 357 U.S. 301, 305 [2 L.Ed.2d 1332, 78 S.Ct. 1190]; see Pen. Code, § 836.)

arrestee's immigration status is per se preempted by the federal government's exclusive power to regulate immigration. We commence our analysis with an examination of *LULAC*. Though the opinion of a federal trial court is not controlling, *LULAC* is unquestionably relevant and worthy of respect.

## III.

*LULAC, supra*, 908 F.Supp. 755, involved consolidated actions for declaratory and injunctive relief to bar the California Governor, Attorney General and other state actors from enforcing provisions of Proposition 187, an initiative measure approved by the voters at the November 1994 general election, requiring state personnel to verify the immigration status of persons with whom they come into contact and to deny undocumented persons various social services, health care, and education benefits. The initiative also required state agencies to report immigration status information to state and federal authorities, and to cooperate with the INS regarding persons whose immigration status is suspect. The plaintiffs urged that the entirety of Proposition 187 regulated immigration "because it forces state employees to make judgments as to an individual's immigration status, gives them the power to effectuate removal of immigrants from the country and thereby establishes California's own INS." (*LULAC*, at p. 769.) The defendants countered that " 'regulation of immigration' has a 'narrow, technical meaning,' " and standing alone, none of the individual provisions of Proposition 187 was " 'essentially a determination of who should or should not be admitted into the country and on what terms those lawfully admitted can remain here.' " (*Ibid.*, quoting *De Canas, supra*, 424 U.S. at p. 355.)

The district court found that certain benefit denial provisions of Proposition 187 were not an impermissible regulation of immigration and preempted because, like the California statute upheld in *De Canas*, the denial of benefits affects immigration only indirectly or incidentally by causing persons not lawfully present in the United States to leave the state or not come here in the first place, and "such a denial does not amount to a 'determination of who should or should not be admitted into the country.' " (*LULAC, supra*, 908 F.Supp. at p. 770, quoting *De Canas, supra*, 424 U.S. at p. 355.)[10]

---

[10] Acknowledging that benefits denial can only occur after an applicant's legal status has been " 'determined,' " the *LULAC* court pointed out that in administering state-federal benefits programs "state agents merely access INS information to verify an applicant's immigration status—no independent determinations are made and no state-created criteria are applied. A requirement that state agents merely *verify* immigration status by referring to INS information is much different from a requirement that state agents actually make determinations as to who is, and who is not, deportable under federal law. Permitting state agents, who are untrained—and unauthorized—under federal law to make immigration status decisions, incurs the risk that inconsistent and inaccurate judgments will be made. On the other hand, requiring state agents simply to verify a person's status with the INS involves no independent judgment on the part

However, the *LULAC* court felt differently about various other provisions of Proposition 187; specifically, certain verification or "classification" provisions (i.e., those which require state officials or other state actors to determine the immigration status of arrestees and applicants for certain benefits or state services by classifying persons based on state-created categories of immigration status) (*LULAC, supra*, 908 F.Supp. at p. 770); "notification" provisions (i.e., those which require state officials or agencies to notify individuals that they are apparently present in the United States unlawfully and must obtain legal status or leave) (*ibid.*); and, perhaps most relevant for our purposes, "cooperation/reporting" provisions (i.e., those which require state agencies to report immigration status to state and federal authorities, and to cooperate with federal immigration authorities regarding persons whose immigration status is suspect) (*ibid.*). The court found that "Proposition 187's verification, notification and cooperation/reporting requirements directly regulate immigration by creating a comprehensive scheme to detect and report the presence and effect the removal of illegal aliens. The scheme requires state agents to question all arrestees, applicants for medical and social services, students, and parents of students about their immigration status; to obtain and examine documents relating to the immigration status of such persons; to identify 'suspected' 'illegal' immigrants present in California; to report suspected 'illegal' immigrants to state and federal authorities; and to instruct people suspected of being in the United States illegally to obtain 'legal status' or 'leave the country.' Thus, Proposition 187's scheme has a direct and substantial impact on immigration." (*LULAC*, at p. 769.)

The specific provision of Proposition 187 most pertinent to our inquiry is section 4, entitled "Law Enforcement Cooperation with INS," which added section 834b to the Penal Code.[11] As the *LULAC* court explained, section 4 "requires law enforcement agencies to verify the legal status of every arrestee who is 'suspected of being present in the United States in violation of federal immigration laws' by 'questioning the person' and 'demanding documentation.' [Citation.] Section 4 requires law enforcement agencies to '[n]otify the person of his or her apparent status as an alien who is present in the United States in violation of federal immigration laws and inform him or her that . . . he or she must either obtain legal status or leave the United States.[']' [Citation.] In addition, section 4 requires the agency to '[n]otify the Attorney General . . . and the [INS] of the apparent illegal status.' [Citation.] Finally, section 4 requires law enforcement agencies to 'fully cooperate with the

of state officials and ensures uniform results consistent with federal determinations of immigration status." (*LULAC, supra*, 908 F.Supp. at p. 770.)

[11] Though its mandatory provisions concerning verification/classification, notification, and cooperation/reporting were declared preempted, and are therefore not enforceable (see 84 Ops.Cal.Atty.Gen. 189 (2001)), section 834b remains in the Penal Code, and we shall hereafter sometimes cite to that statute.

[INS] regarding any person who is arrested if he or she is suspected' of being in the United States illegally and prohibits any local governmental agency from limiting such cooperation in any way. [Citation.]" (*LULAC, supra,* 908 F.Supp. at p. 771.) .

The *LULAC* court concluded that the foregoing provisions "cannot be read except as a regulatory scheme; and indeed, defendants have not seriously urged any other reading." (*LULAC, supra,* 908 F.Supp. at p. 765.) Unlike the benefits denial provisions, these provisions would have more than a purely speculative and indirect impact on immigration, because they were aimed solely at regulating immigration.[12] Section 4 of Proposition 187 was entirely preempted by federal law, the court explained, because under the applicable *De Canas* test, "a state may not require its agents to (i) make independent determinations of who is and who is not in this country 'in violation of immigration laws;' (ii) report such determinations to state and federal authorities; or (iii) 'cooperate' with the INS, solely for the purpose of ensuring that such persons leave the country. The sole stated purpose and the sole effect of section 4 is to impermissibly regulate immigration." (*LULAC, supra,* 908 F.Supp. at p. 771.) Based on this and similar findings regarding other provisions of Proposition 187, the court granted the plaintiffs' motions for summary judgment with respect to the classification, notification, and cooperation/reporting provisions set forth in section 4 and other provisions of Proposition 187. (*LULAC, supra,* 908 F.Supp. at pp. 786–787.)

With the analysis in *LULAC* in mind, we turn to the question whether it supports the trial court's ruling.

# IV.

██ *De Canas, supra,* 424 U.S. 351, instructs that a state statute impermissibly invades the exclusive power of the federal government to regulate immigration if it essentially requires state or local officials to make "a determination of who should or should not be admitted into the country, and [defines] the conditions under which a legal entrant may remain." (*Id.* at p. 355.) As earlier noted, respondents do not say Section 11369 requires state actors to determine whether a particular arrestee should or should not remain in this country, but claim it is nevertheless constitutionally proscribed because it requires such agencies "to participate, in a supporting role, in 'the

---

[12] The court conceded that "the benefits denial provisions also have the purpose of deterring illegal aliens from entering or remaining in the United States, and arguably may be viewed as part of the same regulatory scheme . . ." (*LULAC, supra,* 908 F.Supp. at p. 765); nevertheless it found those provisions permissible because "they have the additional purpose of forbidding the use of public funds to provide social services, health care and education to persons deemed to be present in the United States illegally." (*Ibid.*)

determination of who should or should not be admitted into the country' ";
that is, to use the trial court's characterization, Section 11369 goes too far
because it effectively requires arresting agencies "to act as an investigative
arm of the federal deportation authorities."

Respondents' argument and the trial court's conclusion are not supported
by *LULAC, supra,* 908 F.Supp. 755. The single duty imposed on arresting
officers under Section 11369—to "notify" the federal agency having charge
of deportation matters that it has "reason to believe" an arrestee "may not be
a citizen of the United States"—is significantly different from the duties
imposed on them under section 4 of Proposition 187. Unlike Section 11369,
section 4 of Proposition 187 requires a state or local law enforcement agency
"to verify," i.e., to actually determine to its own satisfaction whether an
arrestee "suspected of being present in the United States in violation of
federal immigration laws" is "a citizen of the United States, an alien lawfully
admitted as a permanent resident, an alien lawfully admitted for a temporary
period of time or . . . an alien who is present in the United States in violation
of immigration laws." (Pen. Code, § 834b, subd. (b)(1).) This determination
is to be made pursuant to a "verification process" that may include "question-
ing the [arrestee]" and "demanding documentation" as to his or her legal
status. (*Ibid.*) If the state or local law enforcement agency determines that the
arrestee is "present in the United States in violation of federal immigration
laws," it must notify the arrestee of this determination and that he or she
"must either obtain legal status or leave the United States." (Pen. Code,
§ 834b, subd. (b)(2).) It is only at that point that a state or local law
enforcement agency is required by section 4 of Proposition 187 to notify
federal immigration authorities of "the apparent illegal status [of the ar-
restee]." (Pen. Code, § 834b, subd. (b)(3).)

Unlike section 4 of Proposition 187, Section 11369 does not require any
state or local law enforcement agency to independently determine whether an
arrestee is a citizen of the United States, let alone whether he or she is
present in the United States lawfully or unlawfully. Nor does the statute
create or authorize the creation of independent criteria by which to classify
individuals based on immigration status, as did section 4 of Proposition 187.
All of those determinations, as well as the duty to tell an arrestee who may be
in this country unlawfully to either obtain legal status or leave, are left
entirely to federal immigration authorities. Section 11369 is also different
from section 4 of Proposition 187 in that it does not apply to all arrestees, but
only to those persons arrested for one or more of 14 specified drug offenses.[13]

---

[13] The apparent purpose of that limitation is discussed, *post,* at pages 939–942.

■ Section 11369 "may indirectly or incidentally affect immigration by causing [undocumented aliens] to leave the state or deterring them from entering California in the first place" (*LULAC, supra*, 908 F.Supp. at p. 770); and it may also result in more deportations of persons unlawfully present in this country. But the crucial fact remains that—like the provisions of Proposition 187 found not preempted in *LULAC*—Section 11369 does not oblige state or local officials to determine "what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization" (*Takahashi v. Fish Comm'n., supra*, 334 U.S. at p. 419), and the statute is therefore not an impermissible state regulation of immigration within the meaning of *De Canas, supra*, 424 U.S. at page 355.

The duty imposed on arresting officers by Section 11369 seems to us more like those upheld in *Gates, supra*, 193 Cal.App.3d 205, than those found impermissible and declared preempted in *LULAC*. The plaintiffs in *Gates* challenged the conduct and actions of the LAPD regarding detainees suspected of being undocumented aliens. The appellate court found unconstitutional a former LAPD policy (Special Order No. 68) that allowed officers to arrest people for violation of civil provisions of the INA because it "impermissibly intruded upon the federal preserve." (*Gates*, at p. 218.)

The LAPD changed its policy in 1979. As the *Gates* court pointed out, the new policy, set forth in LAPD Special Order No. 40, no longer permitted detention or arrest of undocumented aliens solely on account of their illegal status. An officer was directed to contact federal authorities only when a person arrested on state charges was suspected of being in this country unlawfully.[14] For this reason, the court held that "LAPD's transfer of legitimately obtained arrest information to the INS does not constitute enforcement of the civil provisions of the INA." (*Gates, supra*, 193 Cal.App.3d at p. 219.)

Responding to the plaintiffs' contention that the mere questioning of an arrestee about his or her immigration status is constitutionally defective, because its purpose is to enforce the civil provisions of the INA, the court

---

[14] Special Order No. 40 stated that " 'undocumented alien status in itself is not a matter for police action' and directed officers not to 'initiate police action with the objective of discovering the alien status of a person.' Additionally, officers were advised not to arrest or book persons for violations of 8 U.S.C. section 1325 (improper entry by alien)." (*Gates, supra*, 193 Cal.App.3d at p. 211.) LAPD officers were required to relay information to the INS only " '[w]hen an undocumented alien is booked for multiple misdemeanor offenses, a high grade misdemeanor or a felony offense, or has been previously arrested for a similar offense.' " (*Ibid.*)

stated as follows: "Where an LAPD officer legitimately comes across information in the course of investigating a crime which reasonably leads to the belief the person arrested is illegally present in this country, *nothing in either the state or the federal constitution prevents the officer from advising INS of this data.*[15]" (*Gates, supra*, 193 Cal.App.3d at p. 219, italics added.)[16] The court acknowledged that "[i]n such a situation an LAPD officer may, in some abstract sense, be enforcing the civil provisions of federal immigration law because, absent the arrest and notification, the INS would not have been able to deport or exclude the alien. However, such a technical view improperly ignores important practical considerations." (*Gates, supra*, 193 Cal.App.3d at p. 219.) According to the *Gates* court, where an otherwise warranted police investigation leads to evidence of a federal civil or criminal violation, the denial of the right of those officers to provide that information to federal authorities "is not reasonable and rewards those federal violators fortunate enough to be arrested by local, rather than federal, officials. The INS's ability to deport or exclude an alien, legally arrested for a state crime and held in state custody, should not turn on so meaningless a distinction." (*Ibid.*)

---

[15] In *American G.I. Forum v. Miller* (1990) 218 Cal.App.3d 859 [267 Cal.Rptr. 371], decided three years after *Gates*, and relying in part upon it, the court held that the collection and dissemination by local law enforcement officers of information indicating an arrestee's immigration status, does not violate the arrestee's constitutional right of privacy under the California Constitution nor deny him or her equal protection of the laws or due process of law.

[16] In making this determination, the *Gates* court relied on a 1984 opinion of the California Attorney General (67 Ops.Cal.Atty.Gen. 331 (1984)), concluding that local law enforcement agencies are under no legally enforceable duty to report to the INS information about persons who entered the country in violation of federal immigration law, but that officials of such agencies may do so " 'as a matter of comity and good citizenship.' " (*Gates, supra*, 193 Cal.App.3d at p. 219, quoting 67 Ops.Cal.Atty.Gen., *supra*, at p. 332.) The opinion makes but a single reference to Section 11369, which is as follows: "We are unaware of any California statutory authority which would impose on our California public officials an affirmative legal duty to report persons who they know have violated [8 U.S.C.] section 1325 to the INS the way, for example, section 11369 of the Health and Safety Code imposes a duty to notify that agency upon an arresting agency having reason to believe that any person arrested for certain enumerated drug (controlled substances) related offenses may not be a citizen." (67 Ops.Cal.Atty.Gen., at p. 334, fn. omitted.)

The Attorney General has subsequently indicated that the sort of cooperation with federal immigration officials mandated by Section 11369 is constitutionally permissible. In 1992, a Bay Area legislator asked for an opinion on the following question: "May a city prohibit its officers and employees from cooperating in their official capacities with Immigration and Naturalization Service investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of the federal immigration laws." (75 Ops.Cal.Atty.Gen. 270 (1992).) Relying in part upon *Gates, supra*, 193 Cal.App.3d 205 at page 219, the Attorney General answered that, "[d]ue to the supremacy clause of the United States Constitution," a city may not impose such a prohibition on its officers and employees. (75 Ops.Cal.Atty.Gen., *supra*, at p. 270.) The Attorney General reasoned that, like the municipal prohibition stricken in *United States v. City of Philadelphia* (3d Cir. 1986) 798 F.2d 81, the prohibition in question impermissibly obstructs an important objective of federal immigration laws.

We agree that the LAPD special order upheld in *Gates* does not impermissibly intrude upon the exclusive federal power to enforce the civil provisions of the INA. Though the new order touches upon enforcement of the civil provisions of federal immigration law, it does not require or empower LAPD officers to initiate police action to discover a person's alien status, to determine the lawfulness or unlawfulness of an arrestee's immigration status, to set the standards by which an arrestee may remain in this country, or to effectuate the removal of an arrestee determined to be present in this country unlawfully. *Gates* is therefore consistent with our conclusion that Section 11369 is not per se preempted.[17]

## V.

Respondents rely very heavily on the proposition that Section 11369 cannot plausibly be deemed to serve any purpose other than that of impermissibly regulating immigration. They say that, like the per se preempted provisions of section 4 of Proposition 187, "Section 11369 can have only one purpose: to mandate cooperation with the federal immigration officials 'solely for the purpose of ensuring that such persons leave the country.' " The trial court agreed, stating that "Section 11369 cannot be regarded as even primarily about drug use, sale, or possession, because it adds nothing to the State's regulatory scheme for those matters." As should be clear, our conclusion that Section 11369 is not an impermissible state regulation of immigration turns on its text, which no party finds ambiguous, not on any assumption regarding its purpose. Nevertheless, given that the trial court's determination appears to have rested in some degree on its perception of the legislative purpose of Section 11369—as the *LULAC* court's assessment of Proposition 187 rested in part on its perception that section 4 of that measure was aimed solely at regulating immigration (*LULAC, supra*, 908 F.Supp. at p. 771)—we think it appropriate to explain why we do not share the trial court's view that Section 11369 must relate solely to the regulation of immigration because it cannot reasonably be seen as relating in any way to the state's legitimate interest in regulating drug use.

In 1951, two years before the Legislature amended Section 11369 into its present form, the California Senate created the Interim Committee on Narcotics and Hypnotics. The resolution creating the committee (Sen. Res. No. 187 (1951 Reg. Sess.)) explains (by means of three whereas clauses) that the

---

[17] Curiously, the discussion in *Gates* of the issue of federal preemption makes no reference to *De Canas, supra*, 424 U.S. 351, which was then and remains the seminal case on the question whether state or local policy or action dealing in any way with aliens impermissibly intrudes upon the exclusive federal power to regulate immigration. In any case, from all that is said in *Gates* about LAPD Special Order No. 40, it survives scrutiny under the principles set forth in *De Canas*.

Senate created the interim committee because "recent reports of the pathetic and tragic cases of narcotic addictions by teen-age youngsters have shocked the citizens of this State; and [¶] . . . It is the belief of our own enforcement agencies that there exists a deliberate exploitation of naïve boys and girls by drug traffickers, who aim to open up a new market by enslaving a huge new crop of addicts; and [¶] . . . There is urgent need for a comprehensive study of the means to deal with this death-dealing type of racket and to stamp out illicit drug traffic . . . ." (*Ibid.*)

Two years later, during the same regular session in which the Legislature amended Section 11369 into its present form (Stats. 1953, ch. 1770, § 9, p. 3527), the interim committee issued its 43-page report, which focused upon the public debate then taking place in California about whether to significantly increase penalties for offenses involving the sale and use of narcotics. (Sen. Interim Com. on Narcotics & Hypnotics, Rep., 2 Appen. to Sen. J. (1953 Reg. Sess.).) The report stated that "[m]any individuals and civic bodies have communicated with this committee expressing their desires that the Legislature enact more severe penalties. The change most frequently suggested is that the death sentence be imposed upon those convicted of supplying narcotics to minors." (*Id.* at p. 20.) Rejecting this idea as "unrealistic" (*id.* at p. 22), the committee deferred instead to the view of experts that history "indicates that it is certainty and celerity of arrest and conviction that deters offenders rather than severe penalties" (*id.* at p. 23). The report also noted that much of the narcotics sold and used in this state was smuggled in through Mexican nationals also present in this state unlawfully, and that "the present staff of federal agents at [the major] ports of entry in San Diego and Imperial County is totally incapable of effecting the necessary search." (*Id.* at p. 17.)[18]

The present language of Section 11369 evidently reflects a legislative conviction that federal deportation of persons arrested for selling or using narcotics and reasonably believed to be noncitizens could be effectuated with much greater "certainty and celerity" (if federal authorities determined they were unlawfully present in this country) than the prosecution and conviction of such persons for violation of state narcotics laws, and that exposure of such persons to swift imposition of that civil penalty would help "stamp out

---

[18] In 1952, the joint Subcommittee on Narcotics that had been created a year earlier by the Assembly Interim Committees on Judiciary and Public Health also issued a report discussing, among other things, the relationship between the increasing amounts of marijuana and opium being smuggled into California from Mexico and the growing "illegal entry of Mexican farm laborers into the Sacramento and San Joaquin Valley, their population therein at times being estimated to be as high as 20,000." (Final Rep. of Subcom. on Narcotics, Progress Rep. to the Leg. (1953 Reg. Sess.) by Assem. Interim Com. on Judiciary (Jan. 1953), pt. XV, p. 232.)

illicit drug traffic" in California. Other aspects of the legislative history confirm this view. For example, the letter from the author of the bill to the Governor asking him to sign the measure enacting Section 11369 in its present form described it as "the main narcotics bill" enacted by the Legislature that session. (Assemblyman H. Allen Smith, letter to Governor Earl Warren, June 8, 1953, Governor's chaptered bill file on Assem. Bill No. 2238 (1953 Reg. Sess.) (unpaginated).) A memorandum sent by the author of the measure to all members of the Legislature identifies each of the numerous individuals who had assisted in its drafting. All were representatives of state or federal agencies charged with enforcement of narcotics laws; none represented an agency or organization primarily interested in enforcement of federal immigration laws. (Assemblyman H. Allen Smith, mem. No. 2 to all members of the Cal. Leg., Apr. 6, 1953 [entitled "Proposed Narcotic Legislation"], Governor's chaptered bill file on Assem. Bill No. 2238 (1953 Reg. Sess.).) Significantly, the Assembly Committee on Judiciary reported that the bill "to require that the agency arresting any person for a narcotic violation must notify the appropriate agency of the United States having charge of deportation matters when there is reason to believe that said person is not a citizen of the United States" was considered and passed as part of a package of measures that were all designed "*to prevent narcotics from entering the Country*." (Final Rep. of Subcom. on Narcotics, Progress Rep. to the Leg. (1953 Reg. Sess.), Assem. Interim Com. on Judiciary, *supra*, pt. XV, at pp. 240, 255, italics added.)

Finally, if the chief legislative purpose of Section 11369 was the regulation of immigration rather than of the sales and use of narcotics, the measure would not have been limited to persons arrested only for narcotics offenses, and the statute would more likely have been placed in the Penal Code, not in the Health and Safety Code where it and predecessor statutes always appeared in a division, chapter, and article relating to offenses and penalties under the California Uniform Controlled Substances Act (Health & Saf. Code, § 11000 et seq.) or earlier narcotics laws.

■ The foregoing legislative history makes it clear that, unlike the provisions of Proposition 187 declared preempted in *LULAC, supra*, 908 F.Supp. 755, Section 11369 was not designed primarily for the purpose of effecting the removal of persons unlawfully present in this country. The statute may well have that effect, but, as *De Canas* shows, that is not enough to render it a constitutionally impermissible state regulation of immigration. For purposes of assessing whether Section 11369 is per se preempted, the salient factor, as we have been at pains to emphasize, is that it does not require any state actor to determine who is and who is not present in the United States unlawfully. Because Section 11369 "neither add[s] to nor

take[s] from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states" (*Takahashi v. Fish Comm'n., supra*, 334 U.S. 410, 419), we conclude that it is not per se preempted by the exclusivity of federal power to regulate immigration.

## VI.

There remain the questions whether Section 11369 is preempted under the second or third tests set forth in *De Canas, supra*, 424 U.S. 351: either because Congress intended a "complete ouster" of state power to promulgate such a statute even if it does not conflict with the INA or, if Congress had no such purpose, Section 11369 conflicts with the INA. As can easily be shown, neither is the case.

As previously noted (see discussion, *ante*, at p. 928, fn. 7) the INA prohibits any state or local governmental entity or official from prohibiting "or in any way restrict[ing], any governmental entity or official from sending to, or receiving from, the [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (8 U.S.C. § 1373(a).) Additionally, the INA prohibits any person or agency from prohibiting or in any way restricting a state or local government entity from "doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: [¶] (1) Sending such information to, or requesting or receiving such information from, the [ICE]. [¶] (2) Maintaining such information. [¶] (3) Exchanging such information with any other Federal, State, or local government entity." (8 U.S.C. § 1373(b).) Finally, the INA requires ICE to respond to any inquiry by a state or local government agency "seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." (8 U.S.C. § 1373(c).)

The foregoing provisions of the INA definitively establish that, as respondents virtually concede, (1) it was *not* " ' "the clear and manifest purpose of Congress" ' " to effect a "complete ouster" of "state power to promulgate laws not in conflict with federal laws" pertaining to the regulation of immigration (*De Canas, supra*, 424 U.S. at p. 357), and (2) Section 11369 does *not* " 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of [the INA]' " (424 U.S. at p. 363) but furthers those purposes and objectives. Therefore, it is not possible to declare Section 11369 preempted under the supremacy clause pursuant to any applicable test.

## DISPOSITION

The judgment entered by the trial court in respondents' favor on the basis of its order sustaining their demurrer without leave to amend is reversed. The matter is remanded to the trial court for further proceedings to factually determine whether, as respondents alternatively claim, the SFPD complies with Section 11369.

Haerle, J., and Lambden, J., concurred.

A petition for a rehearing was denied November 17, 2008, and the opinion was modified to read as printed above.